**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT LEE GRIFFIN, *Plaintiff-Appellee*, v. JAMES GOMEZ, Director of California Department of Corrections; CHARLES D. MARSHALL; C. A. TERHUNE, Director; ROBERT L. AYERS, JR., Warden, *Defendants-Appellants*. | No. 09-16744 D.C. No. 5:98-cv-21038-JW |

| | |
|---|---|
| ROBERT LEE GRIFFIN, *Petitioner-Appellee*, v. JAMES GOMEZ, Director of California Department of Corrections; C. A. TERHUNE, Director; CHARLES D. MARSHALL; ROBERT AYERS, JR., Warden, *Respondents-Appellants*. | No. 11-15373 D.C. No. 5:98-cv-21038-JW OPINION |

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted
November 9, 2012—San Francisco, California

Filed January 28, 2014

Before: Andrew J. Kleinfeld and Marsha S. Berzon, Circuit
Judges, and William E. Smith, District Judge.[*]

Opinion by Judge Kleinfeld;
Dissent by Judge Berzon

---

[*] The Honorable William E. Smith, District Judge for the U.S. District
Court for the District of Rhode Island, sitting by designation.

# SUMMARY[**]

## Habeas Corpus

The panel vacated and reversed, for abuse of discretion, the district court's 2009 and 2011 orders enforcing its initial 2006 order releasing petitioner from the Security Housing Unit.

Petitioner was validated as an Aryan Brotherhood member in 1979 and put into the SHU at a prison in the California prison system. He claimed that he was no longer an active gang member and in 2006, the district court ordered him released from the SHU. At the time, petitioner was not in the SHU because he had been released into federal confinement as a defendant in a federal RICO case. When he was returned to state custody, he was placed in the Administrative Segregation Unit pending an investigation of his gang status. Based on his conviction in the RICO case, which in turn was based on allegations of gang activity during a period when petitioner claimed he was no longer a gang member, prison officials concluded that petitioner was still an active member and again housed him in the SHU. During this time, the district court issued orders in 2009 and 2011 enforcing its 2006 order to release petitioner from the SHU.

Assuming the validity of the unchallenged 2006 order, the panel held that the district court abused its discretion in issuing the 2009 and 2011 orders, because prison officials did not violate the 2006 order, the order did not amount to a

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

continuing injunction, and the order did not say that petitioner could not subsequently earn his way back to the SHU. The panel further explained that the challenged orders must be vacated for an independent and alternative reason: the district court failed to take proper account of a line of Supreme Court authority limiting federal district court management of state prisons.

Judge Berzon dissented because the only consideration that matters at this juncture is that California has never complied with the original release order, as construed by the court that issued it. She would affirm the 2009 and 2011 orders because the district court reasonably construed its 2006 order, which the state violated instead of seeking appellate review. She expressed no opinion on whether, having complied with the 2006 order, California could then revalidate petitioner as a gang member and send him back to segregated housing.

---

**COUNSEL**

Pamela B. Hooley, Deputy Attorney General, Sacramento, California, for Respondents-Appellants.

Pamela J. Griffin, Omaha, Nebraska, for Petitioner-Appellee.

---

## OPINION

KLEINFELD, Senior Circuit Judge:

We address enforcement of an order regarding conditions of confinement.

## FACTS

Robert Lee Griffin has been imprisoned since 1970. He was originally convicted of robbery and burglary. He committed additional violent crimes while in prison, including murder of another inmate, earning a life sentence. During his confinement, he became a leader in a national prison gang, the Aryan Brotherhood. Because of his gang activities, he has been confined for many years to a "security housing unit" ("SHU"), to protect other prisoners from him and his gang underlings. This appeal addresses the security housing unit aspect of his confinement, not the confinement itself.

California has a chronic problem with murderous prison gangs, typically organized by ethnicity. The gangs engage in extortion, drug trafficking, assault, and murder within the prisons. And, since many prisoners are eventually released, and many have family and friends outside the prisons, the gangs' reach and ability to order assaults and murders extends outside the prisons.

According to the declaration in this case of the Special Agent in Charge of the California Office of Correctional Safety, Griffin's gang, the Aryan Brotherhood, or "AB," originated in San Quentin prison in the 1960s, and has spread throughout the California state prison system and beyond, to

other states' prison systems and to the federal prison system. Once a member of the Aryan Brotherhood, a person is always a member, according to the Special Agent's declaration:

> The AB is a white supremacist group that operates under the principle of 'blood in/blood out,' meaning that in order to become an AB member, the individual must murder someone for the AB, and the only way to get out of the AB is by dying naturally or being killed. Thus membership is for life, as is typical with virtually all prison gangs.

California created the "Office of Correctional Safety" within its Department of Corrections and Rehabilitation to address its prison gang problem. Officers within this unit "validate" an inmate's gang membership by accumulating evidence, and by giving the inmate notice and an opportunity to be heard on whether he is indeed a gang member. The Office considers gang members to be "a severe threat to the safety of others and to the security of the institution," so once "validated," an inmate is placed in a SHU indefinitely.

A classification committee reviews a gang member's SHU status every six months to consider whether or not to release him into the general population. Inmates can also volunteer for "debriefing" to establish that they are "dropouts" from their gangs and obtain release into the general prison population. When an inmate wants to debrief, prison officials interview him, and then house him with other inmates who are debriefing and observe him for a period of time to determine whether he has really left his gang. Debriefing does not require an inmate to disclose crimes he has committed. But he must name other gang members and

discuss past activities of his gang. Over a thousand inmates have been debriefed and released from SHUs in recent decades. As an alternative to debriefing, the prison officials also run an "inactive review" process, where they review the files of inmates who have had no documented gang activity for at least six years, and consider whether or not to release them from the SHU. Over five hundred inmates have been declared inactive and released from the SHU via this process.

Griffin has not been among those gang members released into the general prison population. He was validated as an Aryan Brotherhood member in 1979, and put into the SHU at the California Correctional Institution at Tehachapi in 1987. He was transferred to the SHU at Pelican Bay State Prison in 1989, and remained there until 2002.[1] Prison officials reconfirmed his Aryan Brotherhood membership in 1995 and 1996. In 1999 and 2000, prison officials received several confidential memoranda suggesting that Griffin was still authorizing assaults on behalf of the Aryan Brotherhood. In 2000, they intercepted a "kite" — a letter smuggled past prison officials to another prisoner[2] — that said that Griffin had authorized an assault on another prisoner on behalf of the Aryan Brotherhood.

The notion of "authorizing" an assault relates to the somewhat bureaucratic organization of the Aryan

---

[1] Griffin has apparently been housed intermittently in other prisons. The Special Agent's declaration states that he was housed in the West Valley Detention Center in 1998 and in the California Institution for Men in 1999. Prison officials believe that he was involved in directing Aryan Brotherhood activities while at both of these prisons.

[2] *See United States v. Keys*, 67 F.3d 801, 805 (9th Cir. 1995).

Brotherhood. The California faction of the Aryan Brotherhood is led by a Commission, which orders murders and assaults to keep subordinate Aryan Brotherhood members under control and advance the gang's drug smuggling and other interests. Griffin was a founding member of the Commission. Various intercepted documents suggested to prison officials that Griffin was still a member of the Commission and was still giving instructions in 1999, but was nevertheless "keeping a low profile because of his pending [habeas] case."

Griffin seeks release from the SHU in which he is currently confined. He claims that he is no longer active in the Aryan Brotherhood, but prison officials have not released him through the inactive review process, and he has refused to "debrief." He has argued that debriefing would put him and his family at risk of retaliation for revealing gang secrets. He says that, having ceased all gang activity, he should not have to take that risk in order to be released from the SHU. The prison authorities do not believe that he is inactive or, as they put it, has "retired" from the Aryan Brotherhood. They claim that "retirement" would be inconsistent with the Aryan Brotherhood's "blood in/blood out" requirement. In addition to their doubt that the Aryan Brotherhood allows retirement, prison authorities have received numerous tips from other prisoners that Griffin remains an active leader of the gang.

All this is background. Griffin's arguments in this case are legal, not factual, based on a complex tangle of past litigation. We now summarize the history of this litigation.

In 1992, while incarcerated at the Pelican Bay SHU, Griffin petitioned for a writ of habeas corpus. He sought release from the SHU into the general prison population, not

release from prison, so it was not clear that habeas corpus was the appropriate means of seeking relief. The district court denied the petition. On appeal, we held that Griffin could indeed use the habeas process rather than § 1983, even though he was addressing conditions of confinement rather than the legitimacy or duration of his confinement.[3] One of Griffin's arguments was that holding him in the SHU unless he debriefed was cruel and unusual punishment violative of the Eighth Amendment. We did not decide whether this was so, but instead remanded for further consideration in light of *Madrid v. Gomez*,[4] a district court decision in a class action challenge of which Griffin was a part.

*Madrid* addressed, among other issues, Eighth Amendment claims by prisoners in the Pelican Bay SHU. The court emphasized that the Pelican Bay SHU was unique, "a place which, by design, imposes conditions far harsher than those anywhere else in the California prison system."[5] It had unique architecture imposing extreme isolation, in which the "worst of the worst" prisoners were confined.[6] The prisoners spent 22 ½ hours per day in windowless cells, and their social interaction was sharply limited to their cellmate (if they had one), to hearing but not seeing inmates in adjoining cells, and to closely supervised library, shower, and

---

[3] *Griffin v. Gomez*, No. 95–16684, 1998 WL 81336, at *1 (9th Cir. Feb. 24, 1998); *Cf. Skinner v. Switzer*, 131 S.Ct. 1289, 1299 n.13 (2011); *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005).

[4] *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995).

[5] *Id.* at 1155.

[6] *Id.*

visitor interactions.[7]  When they were allowed outdoors, they were confined in small caged exercise pens surrounded by high walls from which they could not see other prisoners.[8]

Despite these extreme conditions, the district court in *Madrid* was "not persuaded that the [Pelican Bay] SHU, as currently operated, violates Eighth Amendment standards" except for mentally ill inmates and inmates at a "particularly high risk for suffering very serious or severe injury to their mental health" on account of the social isolation in the Pelican Bay SHU.[9]  Griffin has never claimed to be in this category of inmates with mental health deficits.

On remand in 2006, the district court addressed Griffin's habeas petition in light of the *Madrid* class action judgment.[10] The district court held that for Griffin, in his particular circumstances, confinement in the Pelican Bay SHU violated the Eighth Amendment.  Debriefing, the court held, would create a risk to Griffin's personal safety.  And because California did not present any evidence that Griffin was active in the Aryan Brotherhood, nor any evidence as to why it would not release him from the SHU via the inactive review process, the court concluded that inactive review was "at least for [Griffin], an illusory alternative to debriefing." The court determined that the combination of the harsh conditions at Pelican Bay, and prison officials' apparent

---

[7] *Id.* at 1155, 1228–29.

[8] *Id.*

[9] *Id.* at 1261, 1265.

[10] The district judge who sat in Griffin's habeas case was not the district judge who sat in the *Madrid* class action case.

refusal to allow Griffin an inactive review, meant that Griffin had remained in the SHU for twenty years because of his refusal to debrief and "snitch out" Aryan Brotherhood members. It found that the "sheer duration of [Griffin's] submission to the harsh conditions of the Pelican Bay SHU crosses the line to become an unconstitutional threat to his safety" and that "the duration of his confinement vitiates 'active' gang participation, which was the sole justification for his segregation." In a 2006 order, the court granted Griffin's habeas petition and commanded prison officials to "release Petitioner from the SHU immediately," evidently referring to the Pelican Bay SHU, the only one discussed in the order, the one addressed in the *Madrid* class action, and the one in which it thought Griffin was being held. The court gave prison officials a week to confirm that Griffin had been released.

But when the district court ordered the prison system to let Griffin out of the SHU, he was not in it. The State of California advised the court, in response to the 2006 order, that Griffin had been released from the Pelican Bay SHU 3 ½ years earlier, and was currently housed in a federal prison, not in Pelican Bay. The State did not move the court to vacate the order, or appeal it, likely because its command had already been carried out, albeit long before the order rather than in response to it. It was physically impossible for California to violate the court's order when it was issued, because California did not have physical custody of Griffin at that time.

The reason for Griffin's release into federal confinement was that he was a defendant in a massive federal RICO case. The RICO indictment accused him of Aryan Brotherhood activities during the period when he claimed to have become

inactive in the Aryan Brotherhood. Griffin went to trial, and the jury convicted him on January 9, 2007, of conspiring to engage in multiple murders on behalf of the Aryan Brotherhood. According to the indictment, Griffin was on the Aryan Brotherhood's twelve-member California Council and on its California Commission, the three-member body with authority over the Council and over all California Aryan Brotherhood activities.[11] The indictment details numerous murders and attempted murders that Griffin authorized as a member of the Commission. He had a prisoner's father shot and killed outside prison, because the prisoner testified against the Aryan Brotherhood. He had another prisoner choked to death for failure to carry out an order to commit murder. He ordered that a third prisoner be stabbed to death because he had disrespected high-ranking Aryan Brotherhood members. He ordered that a fourth prisoner be murdered for giving information to law enforcement, and that a fifth be murdered for reasons unknown. He also ordered two unsuccessful hits.

The indictment also accused Griffin of being active in an Aryan Brotherhood conspiracy. Griffin's defense to this charge focused on his claim to have withdrawn from active Aryan Brotherhood membership. He has made this claim since at least 1991, when he published a public notice in a California newspaper saying, "I, Robert Lee Griffin, declare to all parties: I am not a member of a prison gang nor am I involved in criminal activity. I have no desire to be associated with either and denounce both." The jury in his

---

[11] According to the indictment, Griffin and other members of the California Commission disbanded the Council in 1989, and increased the Commission from three members to four. In 1994, they increased the number of Commission members to six.

RICO case did not believe him. In its "Special Verdict on Withdrawal," the jury answered "No" to the question "Did defendant ROBERT LEE GRIFFIN withdraw from the conspiracy charged in Count One [for conducting the affairs of the Aryan Brotherhood prison gang] before August 28, 1997?"

The case before us now grows out of the 2006 order. In 2007, after spending about five years in federal prison and after being given a life sentence on his RICO conviction, Griffin was sent back to the California prison system. Prison officials put him in the "Administrative Segregation Unit" ("ASU"), not the SHU, at Pelican Bay pending an investigation of his gang status. As they explained to the district court, any newly-arrived prisoner suspected of being a gang affiliate would be temporarily housed in the ASU while his status was investigated. In 2008, prison officials reviewed Griffin's gang activity within the six years prior to his review, relying on confidential informants, and on the reports of inmates who were debriefing. They concluded that Griffin was still an active Aryan Brotherhood member.

In 2008, before prison officials had concluded their investigation into his gang status, Griffin filed a motion to "enforce" the 2006 order that he be released from the Pelican Bay SHU.[12] He was not then in the SHU. In response to Griffin's motion, the district court directed a magistrate judge to investigate whether or not Griffin's confinement in the Pelican Bay ASU was a violation of the court's 2006 order that Griffin be released from the Pelican Bay SHU. The magistrate judge conducted an evidentiary hearing at Pelican

---

[12] Griffin has been very ably represented by his attorney, counsel Pamela J. Griffin, throughout these proceedings.

Bay, and despite Griffin's "five-year break" from the Pelican Bay SHU and his different housing on return to Pelican Bay, concluded that the prison system was violating the 2006 order, because the ASU was similar to and in some ways more restrictive than the SHU. The magistrate judge found that Griffin "was never released from state custody" because during the five years that he was not in fact in state custody, he was nevertheless classified as being on "out-to-court status." The magistrate judge did not mention the federal trial and conviction. He stated that Griffin's 2008 revalidation was "perfunctory" and did not "relieve [prison officials] of their failure to comply with the court's [2006] order."

In July 2009, the district court adopted the magistrate judge's report and ordered the prison to "immediately transfer Petitioner to the general population or to housing that is less restrictive than the SHU or the ASU." The district court held that prison officials' "technical compliance" with its 2006 order was "improper" because its "restrictive reading of the [2006][13] Order undermine[d] the clear spirit of that Order, which was designed to place Petitioner in housing that was less restrictive than the SHU." This 2009 order is one of two that are the objects of this appeal.

In 2009, before the district court ordered Griffin released from the Pelican Bay ASU, prison officials transferred Griffin to a different prison, California State Prison, Corcoran, where they housed him in the Corcoran SHU. Griffin claimed that this move was in violation of the 2006 and 2009 orders.

---

[13] The district court refers to the "June 6 Order" and the "July 6 Order" interchangeably. But there was no June 6 order, nor was there a July 6 order. Evidently the court meant the June 2006 order, which is what it and the magistrate judge appeared to be discussing and applying.

In March 2010, California filed a Rule 60(b) motion, seeking relief from the 2006 and 2009 orders, based on newly discovered evidence that Griffin remained active in the Aryan Brotherhood. Prison officials filed declarations supporting their view that Griffin ought to be returned to the Pelican Bay SHU, not released into the general population or even retained in the less restrictive Corcoran SHU, because of the danger he posed to other inmates. They based these opinions on new information obtained since his return from federal custody, including an informant who said that Griffin had issued a kill order while in federal custody, and another that called him "the number one man" in the Aryan Brotherhood at Corcoran. They believed that the isolation in the Pelican Bay SHU — the walled exercise yards and limited communication — that concerned the district court were precisely what was necessary to protect other prisoners and hamper Griffin's communication with his gang. The Corcoran SHU is not as isolated. Inmates can talk to each other through chain link fences separating their exercise yards, and can communicate with other inmates more freely as they go to the shower and to medical and administrative appointments. Prison officials feared that if Griffin remained at Corcoran, or was released into the general population, he would continue ordering murders of other inmates and their family members.

The district court denied the Rule 60(b) motion as "premature" because of the pending appeal from its 2009 order, without addressing the prison officials' reasons or the significance of the new information. When California moved for leave to file a motion for reconsideration, the court denied it on the ground that the "premature" motion was also too late, because it was filed more than four years after the 2006 order, and the 2009 order "merely enforced" the 2006 order.

The district court held that the motion could not be considered as moving to modify a continuing injunction, because the 2006 order commanded release from the Pelican Bay SHU "immediately" and did not order continuing relief. The district court has not made any findings of fact as to whether Griffin has, subsequent to the 2006 order, ordered the murder of other inmates or continued his other Aryan Brotherhood activities. Nor has the district court ever addressed the reasons why prison authorities think the risk of inmate murders is too great if they keep Griffin at Corcoran or release him into the general prisoner population.

In 2011, the district court issued a third order. Again, it first asked a magistrate judge to inquire into Griffin's housing situation at Corcoran. The magistrate judge reported that although the Corcoran SHU was "less restrictive" than the Pelican Bay SHU, it was still "impermissibly" restrictive because the conditions "fall short of those envisioned by Judge Ware in his July 10, 2009 order." Again the magistrate judge did not mention the federal jury verdict in the RICO trial subsequent to the 2006 order.

The district court held that even though the magistrate judge had not mentioned the federal RICO verdict or Griffin's 2008 validation as a gang member, he must have been aware of them because the prison authorities had discussed these events in their papers. The district court summarily overruled the prison authorities' objections to the magistrate judge's report and ordered them to "immediately transfer Petitioner to the general population or to housing that is less restrictive than the SHU or the ASU." We stayed this 2011 order pending the resolution of this appeal.

## ANALYSIS

Procedurally, this case is a mess. The orders on appeal are the ones issued in 2009 and 2011. But both say that they are based on the 2006 order. The 2006 order does not state that it is a continuing injunction and the district court subsequently ruled that it was not. The 2006 order only orders Griffin's immediate release from the Pelican Bay SHU. We need not decide whether this order was moot when issued. It is a grant of a petition for a writ of habeas corpus, but it does not require that Griffin be released, just that his conditions of confinement be changed. Though we had held that such an order could issue on a habeas petition,[14] the Supreme Court has since held otherwise.[15] Nevertheless, the 2006 order was not appealed, so we treat it as valid for purposes of this litigation.[16]

The state raises various challenges to the 2006 order, but we need not address them, because even assuming that the

---

[14] *See Griffin v. Gomez*, No. 95-16684, 1998 WL 81336, at *1 (9th Cir. Feb. 24, 1998) ("[H]abeas corpus jurisdiction is also available for a prisoner's claims that he has been subjected to greater restrictions of his liberty, such as disciplinary segregation, without due process of law.") (quoting *Bostic v. Carlson*, 884 F.2d 1267, 1269 (9th Cir. 1989)).

[15] *See Skinner v. Switzer*, 131 S.Ct. 1289, 1299 n.13 (2011) ("[W]hen a prisoner's claim would not 'necessarily spell speedier release,' that claim does not lie at the 'core of habeas corpus' and may be brought, if at all, under § 1983.") (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005)); *see also Blair v. Martel*, 645 F.3d 1151, 1157 (9th Cir. 2011); *Ramirez v. Galaza*, 334 F.3d 850, 859 (9th Cir. 2003) ("[H]abeas jurisdiction is absent, and a § 1983 action proper, where a successful challenge to a prison condition will not necessarily shorten the prisoner's sentence.").

[16] *See Clifton v. California*, 997 F.2d 660, 663 (9th Cir. 1993).

2006 order was valid when issued, and that habeas corpus rather than § 1983 was the proper avenue for relief, the orders currently on appeal cannot stand and must be vacated. The district court appears to have had jurisdiction to issue its 2009 and 2011 orders. They were orders purportedly issued pursuant to the court's inherent authority to enforce its own unappealed habeas grant.[17] We review such orders for abuse of discretion,[18] keeping in mind that courts should exercise their inherent authority with restraint.[19]

## 1.  Prison officials did not violate the 2006 order

In its 2006 order, the district court found that even though the Pelican Bay SHU was not cruel and unusual for prisoners who were not mentally ill or vulnerable, and even though the debriefing requirement to get out was not cruel and unusual, the combination of the two was cruel and unusual for Griffin. In reaching this result, it disregarded the possibility of release from the SHU through the inactive review process, noting that Griffin's review had been pending for five years. The district court assumed, because California then presented it with no evidence of Griffin's continued gang activity, that the duration of Griffin's confinement in the SHU "vitiates 'active' gang participation."

---

[17] *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379–80 (1994); *Hook v. State of Ariz. Dep't of Corrs.*, 972 F.2d 1012, 1014 (9th Cir. 1992).

[18] *See United States v. United States Dist. Court for N. Mariana Islands*, 694 F.3d 1051, 1059 (9th Cir. 2012).

[19] *In re Levandar*, 180 F.3d 1114, 1119 (9th Cir. 1999).

However, much had changed by the time the court issued its 2009 order. When he returned to state custody in 2007, Griffin was placed in the ASU pending reevaluation of his gang status. This reevaluation concluded based on particularized evidence that he had been active in the Aryan Brotherhood within the past six years. Griffin's 2007 RICO conviction further undermined the district court's prior assumption. Griffin was found by the conviction, and by the subsequent reevaluation, to be active in the Aryan Brotherhood while confined in the SHU. The dissent argues that Griffin's RICO conviction could not be used to support his 2008 gang validation because the last overt act supporting the conviction occurred before the six year lookback period for gang validation under the California prison regulations.[20] That is beside the point. Griffin's conviction proves beyond a reasonable doubt that he was involved in gang activities while in the Pelican Bay SHU. The conviction undermines the 2006 order's rationale for finding an Eighth Amendment violation, that Griffin must have ended his Aryan Brotherhood activities long before, because "the duration of his confinement vitiates 'active' gang participation" and the state had not provided evidence otherwise. His Aryan Brotherhood activities were proved beyond a reasonable doubt through 1997 in his federal RICO trial, and the state provided evidence of subsequent Aryan Brotherhood management activities in this case.

Griffin argues that changed circumstances such as his 2007 RICO conviction and 2008 gang validation can only be addressed by a Rule 60(b) motion. However, the state does not point to these circumstances solely in an effort to seek relief from the 2006 order, which we presume to be valid. It

---

[20] *See* Cal. Code Regs. tit. 15 §§ 3341.5(c)(5), 3378(e).

also contends that, in light of these developments, the district court abused its discretion in ordering Griffin's release from the ASU and SHU in 2009 and 2011. Both the RICO conviction and the 2008 validation were repeatedly raised below, and they are properly before this court, notwithstanding the state's failure to appeal the adverse decision on its Rule 60(b) motion.

The 2006 order was limited to the circumstances of Griffin's confinement in the Pelican Bay SHU. The district court itself interpreted it as not amounting to a continuing injunction. It noted when denying California's request for reconsideration of its Rule 60(b) motion that the 2006 order "does not grant injunctive relief or require supervision of changing conduct — it simply orders Respondent to move [Griffin] out of the SHU 'immediately.'" Nor could the 2006 order reasonably be read to have implied that Griffin could never be returned to the Pelican Bay SHU. Such a reading would mean that Griffin could announce that he was again leading the Aryan Brotherhood, publicly order more murders which were carried out, yet still claim an entitlement to free circulation and communication in the general prison population. He is already confined for life terms on federal and state convictions, so he could run his gang and order hits on prisoners and on their relatives outside the prisons with impunity. If the law required that result (which it does not), the law would indeed be "a ass — a idiot."[21]

In addition to the lack of evidence of Griffin's continued participation in the Aryan Brotherhood, the 2006 order noted the particularly harsh conditions of the Pelican Bay SHU and the extended duration of Griffin's confinement there as

---

[21] Charles Dickens, *Oliver Twist* 451 (Tom Doherty Associates 1998).

relevant factors. However, Griffin had already been released from the Pelican Bay SHU when that order was issued. Possibly the case should then have been dismissed as moot and the order vacated for that reason, but the respondents did not seek that relief.**[22]** Moreover, when Griffin returned to Pelican Bay in 2007, after spending five years in federal custody, prison officials placed him in the ASU, not the SHU. After concluding that Griffin was still active in the Aryan Brotherhood, they moved him to the SHU at California State Prison, Corcoran. The magistrate judge's report that the district court adopted says that the Corcoran SHU is less restrictive than the Pelican Bay SHU. And the district court's 2006 order did not address the Corcoran SHU, just the Pelican Bay SHU that the *Madrid* court had found to be unique, and an Eighth Amendment violation only for prisoners with mental health risks.**[23]**

In short, in 2009 and 2011, the district court faced circumstances very different from those that existed when it issued its original order. Griffin had spent five years in federal custody in connection with RICO charges on which he was ultimately convicted so the "duration of his confinement" in the Pelican Bay SHU, central to the district court's 2006 order, no longer existed. Upon returning to Pelican Bay, Griffin, like any other incoming prisoner suspected of gang activity, was placed in the ASU pending

---

**[22]** *See Munoz v. Rowland*, 104 F.3d 1096, 1097–98 (9th Cir. 1997) ("Because [the petitioner] has been released from the SHU, we can no longer provide him the primary relief sought in his habeas corpus petition. [Petitioner]'s Fifth and Eighth Amendment challenges to the 'debriefing' process and the conditions of confinement in the SHU are therefore moot, and must be dismissed.").

**[23]** *See Madrid*, 889 F. Supp. at 1228–30.

evaluation of his gang status. Ultimately, he was "validated" as an active gang member and placed in the Corcoran SHU. The district court, as well as the magistrate judge, overlooked these developments, instead focusing primarily on the conditions of confinement at the ASU and Corcoran SHU relative to the Pelican Bay SHU. However, the rationale of the 2006 order was not so limited. Accordingly, in the circumstances of this case, the district court abused its discretion by finding violations of its 2006 order in 2009 and 2011.

We assume for purposes of discussion the validity of the 2006 order. But its validity does not matter to this appeal. It ordered the state to do something already done, get Griffin out of the Pelican Bay SHU. The district court itself construed it as not a continuing order. It did not say that Griffin could never be put in the SHU at another prison, or that he could never be put in the Pelican Bay SHU again no matter what. His subsequent RICO conviction established that he had been lying about his "retirement" from gang activities, and the evidence developed after his return to the California penal system established that he still was active in the Aryan Brotherhood. His lengthy federal confinement had interrupted the long duration of his Pelican Bay SHU confinement. The uninterrupted duration was the basis for the district court's view that Griffin must have ceased his Aryan Brotherhood activities. Whatever the "spirit" of the 2006 order, it did not say that Griffin could not subsequently earn his way back to the Pelican Bay SHU.

## 2. The 2009 and 2011 orders improperly impede state prison management

The 2009 and 2011 orders must be vacated as an abuse of discretion for an independent and alternative reason, beyond those mentioned above. In issuing those orders the district court failed to take proper account of the line of Supreme Court authority limiting federal district court management of state prisons. Prison administrators are entitled to "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."[24] "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a correctional system and for determining the most appropriate means to accomplish them."[25] Similarly, we have recognized that "deference requires 'that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.'"[26]

Prison management is complex and requires "expertise, planning, and the commitment of resources."[27] Therefore, "[r]unning a prison is . . . peculiarly within the province of the legislative and executive branches of government," and "courts are ill equipped to deal with the increasingly urgent

---

[24] *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

[25] *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

[26] *Norwood v. Vance*, 591 F.3d 1062, 1066–67 (9th Cir. 2009) (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)).

[27] *Turner v. Safley*, 482 U.S. 78, 85 (1987).

problems of prison administration and reform."[28]    In particular, federal courts should exercise restraint when reviewing management decisions taken by prison administrators to secure the safety of prisoners and state prison personnel.  Courts are "'particularly deferential' to prison administrators' regulatory judgments," if "[a]ccommodating [a prisoner's] demands would . . . impair the ability of corrections officers to protect all who are inside a prison's walls."[29]  Also, "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry."[30]  "[I]nternal security is peculiarly a matter normally left to the discretion of prison administrators."[31]  The district court orders are inconsistent with these principles.

Of course, if the California prison system were imposing cruel and unusual punishment on Griffin, the district court could and must command it to stop.  And if California were merely trying to evade the court's 2006 order by putting Griffin in less restrictive housing for a day and then returning him to the SHU, the district court would likewise have authority to command it to stop.  But here, California had no control over Griffin's housing for five years, and did not merely put him back into the Pelican Bay SHU or even the Corcoran SHU when he returned.  They held him in the Pelican Bay ASU, and conducted an investigation into his

---

[28] *Id.* at 84–85.

[29] *Overton*, 539 U.S. at 136 (citing *Turner*, 482 U.S. at 90).

[30] *Bell*, 441 U.S. at 547.

[31] *Rhodes v. Chapman*, 452 U.S. 337, 349 n.14 (1981).

recent gang activity – a wise move when presented with a prisoner who had been active in the Aryan Brotherhood even while confined in the Pelican Bay SHU. Neither the ASU housing nor the investigation violated the district court's 2006 order.

California's prison officials have a duty to Griffin to imprison him in a manner that does not violate the Eighth Amendment. But he is not California's only prisoner. California has an Eighth Amendment duty to its other prisoners as well. Throughout this litigation, prison officials explained their exercise of discretion as necessary for the safety of other prisoners, because Griffin's federal conviction established that their concern is well founded. They fear that if he is placed in less restrictive housing, he will have more opportunity to order beatings and murders on behalf of the Aryan Brotherhood. California's other prisoners may be murderers, rapists, drug dealers, and child molesters, but California is responsible for protecting even those sorts of people from murder by other prisoners. Indeed, the Eighth Amendment requires that prison officials "must take reasonable measures to guarantee the safety of the inmates."[32]

> Having incarcerated persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. . . . Being violently assaulted in prison

---

[32] *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks omitted).

is simply not part of the penalty that criminal offenders pay for their offenses against society.**33**

And California's prison officials owe it to people outside the prison, like the prisoner's father whom Griffin had killed, to try to protect them from murderous conspiracies by those in its charge. "[The State]'s first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves."**34**

In assuring that the punishment imposed is appropriate, the prison authorities must perform a delicate balancing of concerns, generally quite beyond the competence of a district judge. On the one hand, they must stay within the Eighth Amendment boundary for a dangerous criminal like Griffin and the many other dangerous criminals they house. On the other hand, they must, to comply with the Eighth Amendment, protect those very same criminals from each other, which may entail very severe restraints. In this case, prison officials sought to perform this difficult balancing act by confining Griffin as closely as possible, while complying with the district court's orders in a manner that would least endanger others. Their reason for their exercise of discretion was that Griffin's continuing leadership in the Aryan Brotherhood created too much danger to other inmates if he were less closely confined.

---

**33** *Id.* at 833–34 (quotation marks and internal citations omitted).

**34** *Wilkinson v. Austin*, 545 U.S. 209, 227 (2005).

## CONCLUSION

The district court said that its 2009 order was intended to effectuate the "spirit" of its 2006 order. Its 2011 order was intended to effectuate its 2009 order. Both orders evidently invoke the court's inherent authority to effectuate its 2006 order. But "[a] court must exercise its inherent powers with restraint and discretion in light of their potency."[35]  The district court exceeded the boundaries of its authority and ignored the developments subsequent to its 2006 order. We conclude that the district court's 2009 and 2011 orders were an abuse of discretion.

We vacate the 2009 and 2011 orders. We remand with directions to dismiss. Griffin of course may file such suits as may be appropriate from time to time as future developments may warrant.

**VACATED, REVERSED, AND REMANDED.**

---

BERZON, Circuit Judge, dissenting:

Three times — in 2006, 2009, and 2010 — the district court ordered state officials ("California" or "the State") to release Robert L. Griffin from segregated housing conditions. Three times, state officials defied that command. California could have appealed the district court's substantive rulings to us at least twice: after the 2006 Order requiring Griffin's release, and after the district court in 2010 declined to grant

---

[35] *In re Levandar*, 180 F.3d 1114, 1119 (9th Cir. 1999).

a Federal Rule of Civil Procedure 60(b) motion for relief from that order.  But it did not.

The majority does not so frame the case.  Instead, understandably troubled by Griffin's history as a gang leader, it rewrites history, sanctioning California's defiance of judicial orders, excusing its litigation mistakes, and undertaking review of issues beyond our jurisdiction.

So let us be clear what California is appealing, and what the majority is — or should be — ruling on: the two enforcement orders that *followed* the underlying 2006 Order granting habeas and the subsequent denial of relief from judgment under Rule 60(b), both of which are final because the State never appealed them.  As a result, the only issue properly before this Court now is whether the district court misconstrued *its own* 2006 Order when it directed California to transfer Griffin to less restrictive housing in July 2009 and February 2011 ("2009 Order" and "2011 Order," respectively).  As the district court's reading of its own earlier order was more than reasonable, the 2009 and 2011 Orders should be affirmed.  Although one might think otherwise from the majority opinion, resolving that issue — whether the district court misconstrued its own earlier, unappealed order — resolves this case.

Obviously, public safety is a critical consideration.  But the principle that government officials may not defy judicial orders is critical as well, as this country was reminded repeatedly during the civil rights battles of the 1950s and 1960s, *see, e.g.*, *Cooper v. Aaron*, 358 U.S. 1, 18–19 (1958), and again recently with regard to judicial orders to alleviate prison overcrowding, *Coleman v. Brown*, 922 F. Supp. 2d 1004, 1049 (E.D. Cal. & N.D. Cal. 2013).

Whether California, having complied with the 2006 Order and released Griffin from segregated housing, could then revalidate him as a gang member and send him back to segregated housing is not here at issue, and I express no opinion on that question. Instead, I dissent because, as I demonstrate below, the only consideration that matters at this juncture is that California has never — not even for a moment — complied with the original release order, as construed by the court that issued it.

## I.

I begin by identifying the orders *not* on appeal. Doing so explains why the State's failure to appeal these decisions limits the issues before us.

The 2006 Order held that further retention of Griffin in the Security Housing Unit ("SHU") would violate the Eighth Amendment. Specifically, the district court pointed to the combination of the "crushing" conditions of the SHU, an "illusory" gang review process for Griffin, and the "duration of his retention in the SHU for 20 years[,] . . . a shockingly long period of time." Accordingly, the district court directed California to "release Petitioner from the SHU immediately" and to file a notice within one week that it had done so.

Although Griffin "remain[ed] in the constructive custody of the California Department of Corrections and Rehabilitation," he was at the time of the 2006 Order "housed at a federal prison." The State so informed the district court for the first time *after* the 2006 Order issued.

When Griffin returned from federal detention in 2007, the district court reopened proceedings to determine whether

California "complied with" the 2006 Order by placing him in the Administrative Segregation Unit ("ASU") at the Pelican Bay State Prison, and then, later, the SHU at California State Prison, Corcoran. After finding that housing Griffin in the Pelican Bay ASU and the Corcoran SHU violated the "clear spirit" of the 2006 Order, the district court issued orders in 2009 and 2011 to enforce its prior habeas grant.

The State appealed only the 2009 and 2011 *enforcement* orders, not the 2006 Order. Although the State moved in 2010 for relief from the 2006 Order under Rule 60(b), it did not appeal the district court's denial of that motion. The State's decisions not to appeal the 2006 Order or the subsequent denial of relief from judgment significantly narrows the scope of this Court's jurisdiction. We have before us only the question whether the district court abused its discretion in concluding that its 2006 Order had not been complied with, and in devising orders to assure compliance.

## A.

"We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal." *Maness v. Meyers*, 419 U.S. 449, 458 (1975). This "rule is applicable to Governor Brown, as well as the lowliest citizen." *Coleman*, 922 F. Supp. 2d at 1054. "Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect." *Maness*, 419 U.S. at 458. Absent an appeal of the original judgment, Rule 60(b) "provides the vehicle . . . to bring . . . an argument" that "changed

circumstances" merit relief from a judgment. *Horne v. Flores*, 557 U.S. 433, 439 (2009); *see also Gonzalez v. Crosby*, 545 U.S. 524, 534 (2005) ("Rule 60(b) has an unquestionably valid role to play in habeas cases. . . .  In some instances . . . the State . . . seeks to use Rule 60(b)[] to reopen a habeas judgment *granting* the writ.").

**B.**

A party that fails to make an appropriate Rule 60(b) motion, or appeal the denial thereof, is bound by the prior judgment notwithstanding any changed circumstances. *See Clifton v. Attorney Gen. of Cal.*, 997 F.2d 660, 664–65 (9th Cir. 1993). *Clifton* involved the enforcement of a district court order requiring the state to provide a prisoner with annual parole hearings. *Id.* at 665.  The case arose in a slightly different procedural posture from this one: the state had neither appealed the district court's original order granting habeas, *nor* moved for relief from judgment under Rule 60(b). *Id.* at 662–63.  Instead, the state simply refused to comply with the district court's order to provide Clifton with annual parole hearings, on the ground that a subsequent change in the law undermined the court's prior habeas grant. *Id.* at 661–62.  Clifton moved to enforce the court's grant of habeas relief, seeking to require the state to provide a parole hearing as ordered.

On appeal, we characterized the district court's original habeas order as a "judgment [that] ha[d] become final." *Id.* at 662.  In that posture, it was irrelevant that the law under which Clifton was granted relief was no longer valid. Applying the "general principle [that] 'the res judicata consequences of a final, unappealed judgment on the merits [are not] altered by the fact that the judgment may have been

wrong or rested on a legal principle subsequently overruled in another case[,]'" the court concluded that "Clifton was entitled to his final judgment on the merits." *Id.* at 663 (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)).

## C.

In this case, unlike in *Clifton*, the State did move in the district court, in March 2010, for Rule 60(b) relief from the 2006 Order. The State asserted that "newly discovered evidence demonstrates that if this Court requires Respondent to place Griffin in any custody setting less restrictive than SHU, . . . the safety and security of the institution where Griffin is housed would be severely compromised, as would public safety." In support of its motion, the State submitted declarations summarizing evidence that was used to support Griffin's 2008 validation as an gang member. The State also submitted, but then withdrew, four confidential memoranda allegedly evidencing Griffin's involvement with the gang at the Corcoran SHU since 2009.

The district court denied the Rule 60(b) motion on the merits. The denial of a Rule 60(b) motion is a final, appealable order. *See, e.g.*, *Jeff D. v. Kempthorne*, 365 F.3d 844, 850 (9th Cir. 2004). The State did not appeal. The State must therefore treat the court's 2006 Order as valid, and so must we. We likewise cannot review the State's argument, raised in the Rule 60(b) motion, that changed circumstances rendered the 2006 Order obsolete, because the State failed to utilize "the vehicle . . . to bring such an argument" before this Court. *Horne*, 557 U.S. at 439.

Notwithstanding the foregoing, the majority opinion is premised on the district court's failure to consider the existence of "circumstances very different from those that existed when [the district court] issued its original order[.]" Maj. Op. at 21. But any changed circumstances are entirely irrelevant to the question before us. Further, by reaching out to effectively review the district court's Rule 60(b) decision despite the State's failure to appeal it, the majority encourages the State to violate final judgments without either appealing those judgments or seeking relief through the appropriate procedural vehicle.

## II.

As we lack jurisdiction to review the 2006 Order or the Rule 60(b) denial, we are left to consider whether, in issuing the 2009 and 2011 orders, the district court properly exercised its inherent authority to enforce its 2006 Order. As the majority acknowledges, we review such orders for abuse of discretion. *See* Maj. Op. at 18. Accordingly, we may reverse the district court "only when the appellate court is convinced firmly that the reviewed decision lies beyond the pale of reasonable justification under the circumstances." *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000). Unless the district court decision is "illogical, implausible, or without support in the record," *Chun v. Korean Air Lines Co., Ltd. (In re Korean Air Lines Co.)*, 642 F.3d 685, 698 (9th Cir. 2011), we must affirm.

Moreover, courts of appeals must defer to a district court's reasonable interpretation of its own order. *See, e.g.*, *Powell v. Omnicom*, 497 F.3d 124, 133 (2d Cir. 2007) ("defer[ring] to the district court's reasonable and implicit interpretation of its own order"); *Eagle Comtronics, Inc. v.*

*Arrow Commc'n Labs, Inc.*, 305 F.3d 1303, 1314 (Fed. Cir. 2002) ("A district court has great discretion when deciding how to enforce violations of its own orders."); *Cave v. Singletary*, 84 F.3d 1350, 1354 (11th Cir. 1996) (noting "deference on appeal when" "district court's interpretation of its own order" "is reasonable"); *Anderson v. Stephens*, 875 F.2d 76, 80 n.8 (4th Cir. 1989) (noting the "inherent deference due a district court when it construes its own order").

"Deference" is particularly "appropriate in this case, as it has been under the supervision of [the same] District Judge . . . and [the] Magistrate Judge . . . since its inception." *Gates v. Gomez*, 60 F.3d 525, 530 (9th Cir. 1995). Yet, although the majority speaks in terms of abuse of discretion review, Maj. Op. at 18, its analysis belies application of this deferential standard.

## A.

I begin by looking at the circumstances underlying and the district court's stated reasons for issuing the 2009 and 2011 enforcement orders.

The 2006 Order directed California to "release Petitioner from the SHU immediately." On Griffin's return from federal custody, California placed him in the ASU at Pelican Bay. Griffin then moved to enforce the 2006 Order, asserting that his placement in the Pelican Bay ASU violated the court's prior directive. The district court assigned Magistrate Judge Vadas to investigate whether that placement constituted compliance with the 2006 Order and to provide a Report and Recommendation ("R&R").

Magistrate Judge Vadas proceeded to hold extensive evidentiary hearings, during which Griffin's counsel and the magistrate judge examined witnesses about the ASU conditions. The State's Institutional Gang Investigator ("IGI"), John McKinney, testified that "[p]hysically, [the ASU] . . . it's very similar in nature [to the SHU] as far as security measures." IGI Joseph Beeson testified that "in the housing unit itself, the interaction [among prisoners] would be similar to a security housing unit." IGI McKinney testified that exercise conditions were more restrictive in the ASU than at the Pelican Bay SHU, because prisoners exercise in "individual cages." Correctional counselor Doug Edwards testified that the ASU "is a more restricted environment [than the SHU], more property control. Canteen is more controlled. So [Griffin has] lost some of the privileges that he had previously" in the SHU.

The magistrate judge also heard testimony regarding the process by which California revalidated Griffin as a gang member. IGI Beeson admitted that the 2006 Order did not "impact in any way the way [he] . . . investigated Mr. Griffin." Correctional counselor Edwards testified that "based on who [Griffin] is, how long he's been in the department, how long he's been SHU . . . we are currently punishing him for being who he is, what he is . . . ."

Ultimately, Magistrate Judge Vadas concluded that the ASU is "not only similar to the SHU, but is in fact for real purposes more restrictive . . . ." Further, "[t]he fact that Respondents conducted a perfunctory review process of Petitioner's gang status" after he returned from federal jail in 2007, "does not relieve Respondents of their failure to comply with the court's [2006] Order." If Griffin could not be housed in a less restrictive environment, Magistrate Judge

Vadas found, California "should have challenged the [2006] Order, but to" place Griffin in the ASU "is not a proper response to Judge Ware's [2006] Order."   The R&R accordingly concluded that California had not complied with the 2006 Order, when it (1) used the same procedures to validate Griffin as a gang member that the district court previously found deficient; and (2) confined Griffin in similarly harsh conditions as the Pelican Bay SHU.

The district court followed Magistrate Judge Vadas' R&R.   Rejecting California's "restrictive reading" of the 2006 Order as focused solely on the Pelican Bay SHU, the district court held that the State had violated the "clear spirit of that Order, which was . . . designed to place Petitioner in housing that was less restrictive than the SHU."  As the ASU at Pelican Bay was "*more* restrictive than the SHU housing previously condemned by the Court," California's "technical compliance with the [2006] Order" — by moving Griffin from the SHU to the ASU — "was nonetheless an improper response to the Court's directives."   The district court thus ordered California to "immediately transfer Petitioner to the general population or to housing that is less restrictive than the SHU or the ASU."

In my view, the 2009 Order was eminently reasonable — certainly not an abuse of discretion.  The 2006 Order had directed the State to release Griffin from the SHU.   The magistrate judge, who had been "supervisi[ng]" the case "since its inception," *Gates*, 60 F.3d at 530, recommended finding California noncompliant after reviewing an extensive evidentiary record regarding the relevant facts underlying the 2006 Order — both the conditions of Griffin's continued confinement and the procedures pursuant to which California placed him in those conditions.  Relying on those findings,

the 2009 Order simply clarified that the court's 2006 Order applied not only to the Pelican Bay SHU, but to any environment tantamount to the SHU.

The majority takes a different view of the 2006 Order, suggesting that the command to "'release Petitioner from the SHU immediately[]' *evidently referr[ed] to the Pelican Bay SHU*, the only one discussed in the order . . . and the one in which [the district court] thought Griffin was being held." Maj. Op. at 11 (emphasis added). Although the majority's interpretation of the 2006 Order may be a permissible one, so is that of the district court. Under these circumstances, the majority has no authority to substitute its interpretation for that of the trial court.

## B.

Nor did the district court abuse its discretion in concluding that California again violated the 2006 Order by transferring Griffin to the Corcoran SHU.

Griffin adduced evidence that the Corcoran SHU was substantially similar to the Pelican Bay SHU. A declaration submitted by the State admitted that "living conditions are essentially the same in each of [the State's] SHUs." Magistrate Judge Vadas visited the Corcoran SHU, conducted an inspection, and concluded that:

> [t]hough less restrictive in nature than the SHU at [Pelican Bay], Corcoran SHU remains an impermissibly restrictive environment. Every move of an inmate is monitored. Exercise . . . is . . . in outdoor cages . . . . Inmates remain in their cells, except when

> being transferred by escort in chains to medical appointments, law library, disciplinary hearings, and exercise. Inmates . . . are fed in their cells. These housing conditions fall short of those envisioned by Judge Ware in his . . . 2009 Order.

California argued that additional evidence obtained since December 2009, allegedly documenting Griffin's continued gang affiliation, made it impossible to place him anywhere but the SHU. But the State never submitted this evidence for the record, and so Magistrate Judge Vadas correctly refused to consider it.

Based on the evidence actually presented, Magistrate Judge Vadas concluded in 2011 that California "continue[s] to fail to comply with the orders of this Court regarding the conditions of confinement of the Petitioner." The district court agreed, and — as it had done two years prior — directed California to "immediately transfer Petitioner to the general population or to housing that is less restrictive than the SHU or the ASU."

The district court's 2011 Order was entirely reasonable. The 2006 Order mandated Griffin's "immediate[]" release "from the SHU." Interpreting that order to require Griffin's release from the Corcoran SHU — when that facility was similar to the Pelican Bay SHU, and California had failed to comply with *either* of the district court's previous orders mandating release from such restrictive conditions — was well within the court's discretion.

## C.

The majority's arguments to the contrary are not supported by the record. The majority concludes that California "did not violate" the 2006 Order, Maj. Op. at 18, because the 2006 Order "did not address" the ASU or the Corcoran SHU, "just the Pelican Bay SHU[,]" *id.* at 21.

As I have explained, the majority simply disagrees with the judge who issued the 2006 Order as to that order's proper meaning. The majority provides no explanation — none at all — for why it was "illogical, implausible, or without support in the record," *Korean Air Lines*, 642 F.3d at 698, to read the 2006 Order as applying to the Pelican Bay SHU *and* any similarly restrictive environment. Instead, the majority just substitutes its own reading for the district court's interpretation, ignoring the deference we owe that interpretation.

Nor does the majority appear to hold clearly erroneous Magistrate Judge Vadas' factual findings, adopted by the district court, that conditions in the Pelican Bay ASU and Corcoran SHU are similar to the Pelican Bay SHU, and so "fall short of those envisioned by Judge Ware . . . ." Further, although the majority takes issue with the district court's finding that the 2008 gang revalidation was "perfunctory," the majority does not state whether that finding is clearly erroneous, and if so, how.

In fact, the latter finding was not clearly erroneous. Contrary to the majority's suggestion that the State adduced new "particularized evidence," Maj. Op. at 19, to support revalidation, most of the documents lack any details about specific gang activity by Griffin. Instead, they are bare

statements by gang members undergoing debriefing that
Griffin is still involved in the gang.  And ten of the fifteen
"new" documents produced by the State predate the 2006
Order.

Moreover, Griffin's 2007 RICO conviction could not,
under the relevant prison regulations, be used to support
Griffin's 2008 gang validation.  *See* Cal. Code Regs. tit. 15
§§ 3341.5(c)(5), 3378(e).  The last overt act supporting that
conviction occurred in 1997, *before* the six year lookback
period for gang validation.  *Id.*  Presumably in recognition of
these regulations, the State has never cited Griffin's RICO
conviction as a basis for keeping him the SHU or ASU.  The
majority's criticism of the district court for failing to consider
whether the RICO conviction rendered the 2008 revalidation
appropriate, rather than perfunctory, is therefore misplaced.

Unless the district court's reading of its own order was
unreasonable, or its factual findings clearly erroneous, there
is no basis for the majority's conclusion that California
complied with the 2006 Order by moving Griffin from one
housing unit to another without meaningfully changing his
conditions of confinement.

## III.

Perhaps to cover over its usurpation of the district court's
enforcement authority, the majority suggests that the district
court erred by failing to exercise its authority "with restraint."
Maj. Op. at 18.  Judicial restraint is a virtue, but not when a
party repeatedly disregards court orders.

In rejecting the district court's reasonable interpretation
of its own order, and saving the State from its own poor

litigation choices, the majority opinion serves only to encourage California's future noncompliance with court directives. The message it sends is clear: the State may refuse to comply with valid court orders, fail to appeal adverse decisions, and decline to take appropriate steps to seek relief. As long as the State has a "well founded" "concern" that compliance with the Constitution will jeopardize the safety of other prisoners — a defense that will often be available where prisoners confined to restrictive housing units are involved — the State's disregard of court orders will be excused. Maj. Op. at 25.

The majority criticizes the district court for "'substitut[ing its] judgment for that of officials who have made a considered choice'" regarding Griffin's housing. *Id.* at 23 (citations omitted). I certainly agree that we "must be sensitive to the State's . . . difficult and dangerous task of housing large numbers of convicted criminals." *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011). But "[c]ourts nevertheless must not shrink from their obligation to 'enforce the constitutional rights of all "persons," including prisoners.'" *Id.* (citation omitted). We "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id*. at 1928–29. And "'where federal constitutional rights have been traduced, . . . principles of restraint, including comity, separation of powers and pragmatic caution dissolve . . . .'" *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 860–61 (9th Cir. 1992) (citation omitted).

The district court here held that Griffin's federal constitutional rights were violated by his extremely prolonged confinement in extremely restrictive conditions. Whether the district court was right or wrong in that regard is *not* our

concern at this point, and so the deference ordinarily owed to prison officials is beside the point. What *is* the point is that the State may not violate court orders as to which it never sought appellate review. There is just no basis for upsetting the enforcement orders issued by the district court, which had "supervis[ed]" this difficult case "since its inception[,]" *Gates*, 60 F.3d at 530, visited the facilities, conducted extensive evidentiary hearings, and fashioned the relief being enforced.

On the narrow issue before us, I would affirm. I therefore, respectfully, dissent.