**UNITED STATES COURT OF APPEALS**      **May 22, 2014**

**TENN CIRCUIT**

_____

THOMAS SILVERSTEIN,

    Plaintiff-Appellant,

v.

FEDERAL BUREAU OF PRISONS; JOHN
VANYUR; JOYCE CONLEY; MICHAEL
NALLEY; RONNIE WILEY,

    Defendants-Appellees.

_____

ASSOCIATION OF BLACK
PSYCHOLOGISTS; COALITION FOR AN
ETHICAL PSYCHOLOGY; MENTAL
HEALTH AMERICA; THE MENTAL
HEALTH PROJECT OF THE URBAN
JUSTICE CENTER; NATIONAL
ALLIANCE ON MENTAL ILLNESS;
PHYSICIANS FOR HUMAN RIGHTS;
PSYCHOLOGISTS FOR SOCIAL
RESPONSIBILITY; STANLEY L.
BRODSKY, Ph.D.; CARL CLEMENTS,
Ph.D.; KEITH R. CURRY, Ph.D.; CARL
FULWILER, M.D., Ph.D.; RAFAEL ART
JAVIER, Ph.D.; ALLEN KELLER, M.D.;
TERRY A. KUPERS, M.D., M.S.P.; DAVID
LOVELL, Ph.D., M.S.W.; MONA LYNCH,
Ph.D.; KATHERINE PORTERFIELD, Ph.D.;
KERAMET REITER, Ph.D., J.D., M.A.;
PETER SCHARFF SMITH, Ph.D.; HANS
TOCH, Ph.D.; PATRICIA A. ZAPF, Ph.D.,

    Amici Curiae.

No. 12-1450
(D.Ct. No. 1:07-CV-02471-
PAB-KMT)
(Colo.)

―――――――――――――――――――――――

## ORDER AND JUDGMENT[*]

―――――――――――――――――

Before **LUCERO**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**O'BRIEN**, Circuit Judge.

―――――――――――――――――

Appellant Thomas Silverstein appeals the district court's grant of summary

judgment in favor of Appellees (hereafter also collectively referred to as BOP).

Mr. Silverstein alleges the duration of his thirty years in solitary confinement

constitutes cruel and unusual punishment in violation of the Eighth Amendment.[1]

In support, he contends the district court impermissibly ignored the first twenty-

two years of his confinement on statute of limitations grounds and improperly

resolved a factual dispute on whether isolation from social contact and

environmental stimulation harmed him mentally or psychologically and places

him at a substantial risk of future harm. As part of his declarative and injunctive

request for relief, Mr. Silverstein suggests his "isolation [be] lessened."

―――――――――――――――――――――

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Mr. Silverstein is not appealing the district court's order granting, in part, Appellees' motions to dismiss various claims against Appellees or its order granting their motion for summary judgment on Mr. Silverstein's Fifth Amendment due process claim. *See Silverstein v. Fed. Bureau of Prisons*, 704 F. Supp.2d 1077 (D. Colo. 2010). As a result, only his Eighth Amendment claim against the BOP stands on appeal.

Exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  Undisputed Factual Background

We review the pleadings and record on appeal to ascertain whether genuine issues of disputed material facts exist prohibiting summary judgment resolution as a matter of law.  As a preliminary consideration, we view the evidence in the light most favorable to Mr. Silverstein as the nonmoving party.

It is undisputed Mr. Silverstein started his time in federal custody in 1978 when he began serving a fifteen-year sentence in the United States Penitentiary at Leavenworth, Kansas (Leavenworth), for bank robbery.  In February 1979, based on an internal investigation and the BOP's belief Mr. Silverstein stabbed and killed a fellow inmate, Danny Atwell, it transferred him to the Control Unit at the United States Penitentiary in Marion, Illinois (Marion).[2]  While housed at Marion, a jury convicted Mr. Silverstein for the 1981 murder of Robert Chappelle, who was strangled in his cell after Mr. Silverstein and another inmate, Clayton Fountain, reached into his cell and strangled him with a cord.  *See United States v. Silverstein*, 732 F.2d 1338, 1342 (7th Cir. 1984) (*Silverstein II*).  In affirming

---

[2]  Initially, a jury convicted Mr. Silverstein for Mr. Atwell's murder and he was sentenced to life imprisonment; while this court affirmed the district court's consideration of Mr. Silverstein's membership in the Aryan Brotherhood gang as probative, we nevertheless reversed and remanded for retrial based, in part, on an error in the admission of certain hearsay testimony of another inmate.  *See United States v. Silverstein*, 737 F.2d 864, 866-69 (10th Cir. 1984) (*Silverstein I*).  By then, Mr. Silverstein was serving life sentences for at least two other prison murders, *see United States v. Fountain*, 768 F.2d 790, 793 (7th Cir. 1985), and the government declined to retry Mr. Silverstein for Mr. Atwell's murder.

Mr. Silverstein's conviction and life sentence, the Seventh Circuit pointed out Mr. Silverstein belonged to the three-man commission governing the Aryan Brotherhood and killed Mr. Chappelle, an African-American inmate, as a favor to another gang known as the "Mexican Mafia." *Id.* at 1341-42.

In September 1982, Mr. Silverstein and Mr. Fountain killed another inmate, Raymond "Cadillac" Smith, a leader in the "D.C. Blacks" gang located at Marion, by stabbing him sixty-seven times with homemade knives fashioned from bed frames and towel racks. Mr. Silverstein was convicted of the murder and received another life sentence. *See Fountain*, 768 F.2d at 793.

Following these murders, the BOP implemented an additional security measure in which three unarmed guards handcuffed and escorted Mr. Silverstein and Mr. Fountain each time they left their Marion control unit cells to go to and from the recreation room, law library, or shower. *Id.* at 793. In October 1983, while being escorted by three guards from the shower to his cell, Mr. Silverstein stopped next to another inmate's cell, drew a home-made shank protruding from that inmate's waistband, and attacked and killed BOP Officer Merle Clutts, one of the three guards, stabbing him twenty-nine times. *Id.* at 793-94. Mr. Silverstein was again convicted of murder. *Id.* As a result of the three murders for which he received convictions, Mr. Silverstein is serving three consecutive life sentences plus forty-five years incarceration.

On November 2, 1983, following the October 1983 murder of Officer

Clutts, the BOP transferred Mr. Silverstein from Marion to the United States Penitentiary in Atlanta, Georgia (Atlanta), where he was initially housed in a secure living area in control unit status.[3]  In August 1984, pursuant to a memorandum issued by the then BOP Director, he was housed in a special unit designed to meet his particular needs with specific restrictions placing him in "non-contact" status, limiting his visits, and restricting his recreation and programming.  However, the memorandum also directed that daily visits occur from unit staff or a physician's assistant.  Mr. Silverstein remained in the special unit for three years, until December 1, 1987, when the BOP transferred him back to Leavenworth.

For his first eighteen months at Leavenworth, the BOP housed him in a basement cell where he had no access to hot water or outdoor recreation and often did not receive three meals a day.  In 1989, he was transferred to a secure area in the Special Housing Unit consisting of a 136-square-foot cell with a bed, toilet, shower and sink with hot water, ten-inch television, writing area, duress button, indoor and outdoor recreation areas, and a visitation space.  In addition, Mr.

---

[3]  According to Mr. Silverstein, for the first year at Atlanta, he had no windows or clock in his cell; was subjected to twenty-four hours of continuous lighting by florescent lights that buzzed; had no contact with other inmates and only minimal contact with staff; exercised and ate alone; received only one hour of outdoor recreation a week and only one hour of indoor exercise four times a week; was subjected to extreme hot and cold temperatures; and had no social visits, phone privileges, reading materials, art supplies, radio, or television. However, after the first year, he admits he was allowed basic privileges.

Silverstein was generally allowed to recreate for one and a half to two hours, five days a week, with access to media, reading materials, and the law library. Kept under constant audio and visual surveillance in his cell, the BOP admits that for all but one or two years of his seventeen years at Leavenworth Mr. Silverstein did not have control over the lights in his cell, which stayed on twenty-four hours a day. Between 2001 and 2005, only staff directly responsible for his custody, care, and treatment went into his housing area; he experienced no contact with other inmates; and four officers escorted him any time he left his cell. When transported, he wore handcuffs, a Martin waist chain, a black security box, and leg irons. From 2001 to 2005, he was evaluated by a staff psychologist or psychiatrist approximately forty-seven times.

On July 12, 2005, the BOP transferred Mr. Silverstein to the Administrative Maximum facility, known as "ADX," in Florence, Colorado (ADX Florence), because Leavenworth changed to a medium security facility which could not provide secure confinement of Mr. Silverstein. The parties agree ADX Florence is the most restrictive BOP facility in the nation. Initially, the BOP housed Mr. Silverstein in Range 13, where the conditions were similar to those at Leavenworth. On April 3, 2008, the regional director instructed the ADX warden to move him to a general population cell in the D-Unit, where he remains housed today. Between April 4, 2008, and August 10, 2009, the warden approved daily management procedures for Mr. Silverstein, in addition to the procedures for

other ADX general population inmates, for the purpose of assessing how he was adjusting to less restrictive conditions. In July 2009, the current warden discontinued these additional procedures, and since then, Mr. Silverstein has been subjected to the same procedures as all other ADX general population inmates.

In the D-Unit, Mr. Silverstein has a window looking outside; he can communicate with other inmates by yelling from cell to cell (or during recreation in areas adjacent to each other); he and all inmates receive a minimum of two fifteen-minute telephone calls and up to five social visits per month; and each cell contains a black-and-white television with sixty channels and closed-circuit programs, as well as a shower stall, sink, hot water, toilet, stool, desk, and shelf.[4] While his cell contains lights with four brightness settings which Mr. Silverstein controls, his cell remains lit by hall lights twenty-four hours a day. In D-Unit, inmates eat their meals in their cells and may choose a "no-flesh" diet, which Mr. Silverstein prefers; he is also given art supplies and has access to radio stations, digital music, and closed-circuit programming, from which he has taken various educational courses. Mr. Silverstein has daily interaction with staff, including corrections officers who perform daily rounds in three shifts; his unit team members who visit him each day Monday through Friday; department heads who perform weekly rounds to visit each inmate; staff who perform periodic reviews;

---

[4] Mr. Silverstein points out he has had only two social visits since 2005, stating it is difficult for his family to travel to Colorado and that he is restricted from visits from those he did not know prior to his incarceration.

and medical, religious, and psychology staff when they perform rounds, or on request. He also corresponds with several individuals and has access to reading materials through multiple libraries. Finally, inmates in D-Unit receive ten hours of recreation time per week and have access to both indoor and outdoor recreation.

When Mr. Silverstein arrived at ADX Florence in July 2005, a BOP psychologist performed an initial psychological screening interview, finding him well oriented with favorable psychological stability. During his time in Range 13, evidence shows he was evaluated an average of once a month by BOP psychological staff, for a total of thirty-nine times. Once Mr. Silverstein was moved to D-Unit in 2008, he was not seen by BOP psychology providers based on his assessed stable mental health status, placement in the ADX Florence general population unit, and his stated desire not to have psychological services. However, in October 2009, based on his claims of mental health problems alleged in the instant case, he was evaluated by a staff psychologist and reported having symptoms of anxiety; he was prescribed Zoloft and, after he complained that his symptoms continued, his dosage was increased; eventually, he was prescribed Buspar, to which he reported no relief but continues to take. While offered self-help materials and notified of available psychology programs, he has refused both. After being designated to the ADX Florence D-Unit, BOP records provided through November 2010 show psychology providers visited and evaluated him ten

more times, for a total of forty-nine times; in addition, he is able to request a consultation with a psychologist or psychiatrist at any time.

In addition to his three murder convictions, Mr. Silverstein's disciplinary record includes assaults on three staff members, a threat to a staff member, an escape attempt by posing as a United States Marshal, and the discovery of weapons, including two hacksaw blades, handcuff keys, and two lock picks in his rectum.[5] However, all of these offenses occurred before or during the 1980s, and Mr. Silverstein has not received a citation for a disciplinary infraction since 1988. Since 2002, BOP psychology staff have primarily rated Mr. Silverstein as a low risk of violence. The BOP Chief of Psychology responsible for the low-risk rating explained it was based not only on Mr. Silverstein's behavior but his current housing conditions, including his lack of access to weapons or potential victims. Another BOP psychiatric expert also explained Mr. Silverstein received a low risk of harm rating based on his "*current* maximum custody." (Emphasis added.)

---

[5] Mr. Silverstein's murder convictions do not include his alleged murder of Mr. Atwell, which was reversed but never retried. *See Silverstein I*, 737 F.2d at 866-69. We note he was also implicated in the 1979 murder of another inmate located at another penitentiary where, as the Eleventh Circuit explained, evidence was introduced establishing Mr. Silverstein, as an Aryan Brotherhood "commissioner," put a contract out for the victim's murder, and another inmate, Barry Mills, performed that contract by killing the victim. *See United States v. Mills*, 704 F.2d 1553, 1555 (11th Cir. 1983). While Mr. Silverstein was not convicted of these two murders, they nevertheless are indicative of the type of gang conduct the BOP believes Mr. Silverstein is involved in, as discussed hereafter.

II.  Procedural Background and Additional Undisputed Facts

On November 28, 2007, Mr. Silverstein filed a complaint for declaratory and injunctive relief against the BOP, and on March 15, 2008, filed an amended complaint, after which, on May 13, 2009, his claims were dismissed without prejudice based on a joint stipulation for dismissal.  Shortly thereafter, on May 14, 2009, Mr. Silverstein filed his second amended complaint for declarative and injunctive relief against the BOP, claiming a violation of his Eighth Amendment right to be free from cruel and unusual punishment.  In support, he claimed the conditions and duration of his thirty-year confinement led to social and environmental sensory deprivation which caused him psychological harm and/or will cause a substantial risk of future psychological harm if continued.[6]  As part of his request for declaratory and injunctive relief, Mr. Silverstein sought immediate discontinuation of his administrative segregation and an order transferring him to another facility with less restrictive and severe conditions of confinement or, alternatively, his assignment to a "step-down" or other program in which he could earn or advance to less restrictive conditions of confinement.

The BOP filed a motion for summary judgment in which it did not dispute: 1) Mr. Silverstein has committed no infractions since 1988; 2) he publicly apologized to Officer Clutts's family; 3) the most predictive demographic of

_____

[6]  While Mr. Silverstein also claimed he suffered from certain physical health conditions and received improper medical care for such conditions, he does not raise these issues on appeal and they are therefore waived.

-10-

future dangerousness is a criminal's age (Mr. Silverstein is now sixty-two years old); and 4) he received a low risk of violence rating by its staff. However, it maintained his low risk of violence rating was tied to his continued confinement in isolated conditions and is not a predictor of his potential behavior in a less restrictive environment.

Turning to his mental health, the BOP did not dispute Mr. Silverstein's expert evidence that individuals in solitary confinement have experienced symptoms of appetite and sleep disturbances, anxiety, panic, paranoia, hallucinations, self-mutilations, hypersensitivity, cognitive dysfunction, hopelessness, suicidal ideation, and withdrawal. It also did not dispute Mr. Silverstein has psychiatric or mental issues, agreeing he: 1) had no prior mental health history but has now been diagnosed with anxiety disorder and tested positive for cognitive impairment; and 2) reported various symptoms of psychological distress to BOP officials over the years, including hopelessness, troubles with concentration, memory loss, and depression, and that BOP staff noted these symptoms and attributed many of them to his isolation and other conditions of confinement. However, it argued he has no major mental health illness but experiences only minor mental health symptoms, as admitted by all the experts, and that even if a substantial risk existed as to future harm, it has not disregarded that risk because its mental health staff regularly check on and evaluate his mental health and have provided treatment to him when requested.

-11-

It also addressed his membership in the Aryan Brotherhood, explaining its belief such membership is the reason for the commission of his past murders and a key factor requiring his continued incarceration in restrictive conditions. In support, the BOP proffered undisputed evidence from two witnesses who explained the Aryan Brotherhood is the most violent gang in the federal prison system, it formed in the 1960s in the California prison system and spread to federal prisons, and a three-inmate commission runs the gang in the federal system. *See Griffin v. Gomez*, 741 F.3d 10, 12, 15 (9th Cir. 2014) (discussing the Aryan Brotherhood and noting its three-inmate commission system). According to the BOP's gang expert, the Aryan Brotherhood runs drug trafficking and extortion operations in the federal prisons and is responsible for multiple internal disciplinary homicides committed on its own members as well as murders of rival gang members. *See id.* at 12. To qualify for membership in the Aryan Brotherhood, an inmate must establish his credentials by "making bones," which means committing murder, and that within the gang "shot callers" or "commissioners" are the only ones with authority to order "hits," or assassinations. If a member is instructed to perform an act, he must carry it out or be disciplined, either by beating or death.

According to the same expert, retirement from the Aryan Brotherhood does not exist, and members consider death as the only means of severing membership in the gang. *See id.* The BOP's expert also offered undisputed evidence that

because of deadly rivalry and retaliatory hits against each other, members of the D.C. Blacks (now known as the "D.C. Crew") and the Aryan Brotherhood must be separated in all federal prisons, and no influential member of either gang is allowed to interact in the open prison population.

As discussed by the BOP's expert, Mr. Silverstein rose through the ranks of the Aryan Brotherhood and, by 1981, became a "shot caller" or "commissioner" for the gang. Indeed, his leadership position in the Aryan Brotherhood has been the source of discussion in three circuit cases. *See, e.g., Silverstein II*, 732 F.2d at 1341-42 (confirming Mr. Silverstein's position as one of the three commissioners of the Aryan Brotherhood in the federal prison system); *Mills*, 704 F.2d at 1555 (same); *Fountain*, 768 F.2d at 793 (characterizing Mr. Silverstein as one of the "masters of prison murder"). For this reason, the BOP expert explained Mr. Silverstein is legendary within the federal prison system and the Aryan Brotherhood. According to the BOP's expert, Mr. Silverstein remains a flashpoint for the D.C. Crew, and it would be a badge of honor for current members of that gang to kill Mr. Silverstein to avenge his murder of Mr. Smith–a leader in the D.C. Crew gang. While Mr. Silverstein claimed or perceived he is no longer a member of the gang, the BOP's expert explained such a claim or perception is unrealistic because Aryan Brotherhood members are not allowed to leave the gang. Therefore, it is the expert's and the BOP's belief Mr. Silverstein's membership is continuing and permanent, and a risk remains he may

-13-

be asked at any time to assume his leadership role or perform violent tasks for the gang, and if he were to refuse, he would be beaten or killed at the hands of other Aryan Brotherhood members.

The same expert also discussed the undisputed fact that Mr. Silverstein's institutionally conforming conduct occurred when he was not with other inmates and that his conduct, when he is allowed to have physical proximity to others, has been marked by threats, assaults, and murders. According to this expert, the only means for Mr. Silverstein to affirmatively separate himself from the Aryan Brotherhood and for the BOP to protect him is to undergo a formal debriefing and enter protective custody in which he would continue to have to be separated from other inmates; however, he has not indicated his interest in such a process.[7]

Finally, as part of its motion for summary judgment, the BOP argued a six-year statute of limitations applied, barring relief, because Mr. Silverstein failed to commence his action within six years after his right of action first accrued. In support, it argued his Eighth Amendment claim accrued in November 1983 when the BOP first placed him in isolation under special safety restrictions, and that his claim is barred given the six-year limitations period expired after that date.

---

[7] The same expert also provided evidence of an Aryan Brotherhood sympathizer who reached out to Mr. Silverstein through his blog, asking in code for permission to perform an act on behalf of the Aryan Brotherhood. Mr. Silverstein disputed this assessment, contending the message came from a family friend asking for permission to start a Facebook page, and therefore, we review this disputed fact in Mr. Silverstein's favor on appeal.

In ruling on the BOP's motion for summary judgment, the district court determined the six-year limitations period in 28 U.S.C. § 2401(a) applies to claims for equitable relief against the United States, and Mr. Silverstein's claim for such relief was not time-barred because it covered the six-year period prior to his complaint, which it determined was primarily tied to his current conditions imposed in July 2005 at ADX Florence. Thus, the district court determined Mr. Silverstein's Eighth Amendment request for injunctive relief was limited to the conditions imposed after his July 2005 transfer to ADX Florence, and not his prior confinement at Leavenworth because he had not shown he is likely to be subject to those conditions again.

With respect to the objective component of any deprivation related to his time at ADX Florence, the district court determined Mr. Silverstein failed to introduce sufficient evidence of an objectively serious deprivation or substantial risk of harm related to a lack of social interaction and environmental stimulation for the purpose of surviving summary judgment. In making this determination, it acknowledged Mr. Silverstein spent thirty years in isolation but found he was not deprived of social interaction and environmental stimulation and that his mild symptoms of anxiety, memory loss, and cognitive impairment during the six years in question were not shown to be related to any such deprivation or that these mild symptoms would rise to a substantial risk of serious injury in the future.

More specifically, the district court found Mr. Silverstein's assertion he

was deprived of social interaction and environmental stimuli inconsistent with the record, showing that since his arrival at ADX Florence he has been allowed two fifteen-minute phone calls and five non-contact visits each month; five hours of indoor or outdoor recreation per week with an additional five hours of outdoor or indoor recreation since his transfer to D-Unit in April 2008; and communication with guards, staff, and other inmates since his transfer to D-Unit. It also noted: 1) other than anxiety, Mr. Silverstein denied any other mental health concerns; 2) the record showed his psychological complaints were promptly handled; and 3) since his arrival at ADX Florence, the record indicated he had at least forty-nine sessions with the psychological department as they continued to treat his symptoms with different medications.

With respect to Mr. Silverstein's experts, the district court noted their opinions as to his mental harm relied on studies performed on other prisoners, and the record was devoid of actual instances where Mr. Silverstein personally suffered panic, rage, loss of control, or paranoia. In dismissing his claim on sleep deprivation, the district court held, in part, Mr. Silverstein failed to prove a direct connection between his insomnia and confinement, given his expert, Dr. Williams, only alleged, based on generalized studies and not treatment of Mr. Silverstein, that "conditions of confinement *may* be the cause of his insomnia." While two of Mr. Silverstein's doctors administered tests to determine his cognitive impairment, the district court noted one, Dr. Williams, was unable to

attribute Mr. Silverstein's memory impairment to the conditions of his confinement, stating only that his memory impairment could be directly caused by his isolation, while also stating she was unable to discern the causes for his memory impairment. As to the other expert administering the cognitive impairment test, the district court noted Dr. Friedman, who found Mr. Silverstein had "mild cognitive impairment," also could not definitively conclude Mr. Silverstein's mild cognitive impairment was attributable to isolation and sensory deprivation but only that it "may be associated" and had concluded that, together with his anxiety, Mr. Silverstein's mild cognitive impairment would not "necessarily interfere with [him] functioning in a reality-oriented manner," and Mr. Silverstein "did not demonstrate or exhibit any evidence of ... a major mental illness ...."

The district court also noted the record contained the undisputed opinion of the BOP psychiatrist, Dr. Bursztajn, that "Mr. Silverstein shows no significant indications of having been harmed by the restrictions placed on him at Leavenworth and ADX Florence. I do not find evidence of damage to Mr. Silverstein's mental health resulting from the conditions of confinement." The same doctor also said Mr. Silverstein "does not suffer from significant confinement-related psychopathology" and has no "major mental health

disorders."[8]  The district court also pointed out that Dr. Denney, who acted as Mr.

Silverstein's psychiatrist for over a decade, labeled him as "resilient" and found

he "maintained that sense of resilience from the move from [Leavenworth to]

ADX [Florence]."[9]

Based on this and other evidence in the record, the district court found that,

despite Mr. Silverstein's assertions, undisputed facts in the record show

confinement in isolation had a minimal impact on his mental state.  It also found

his complaints of anxiety, memory loss, and cognitive impairment failed to rise to

the level of a severe risk of serious injury because they have been diagnosed as

mild and may be kept under control through evaluation, medication, therapy, or

access thereto.  Having reached this conclusion, the district court did not

elaborate on the subjective component of Mr. Silverstein's Eighth Amendment

claim as to whether he showed the BOP deprived him of medical care with regard

to his mental health, otherwise acted with "deliberate indifference" in providing

---

[8]  The same doctor also stated that even though Mr. Silverstein has
refrained from acts of physical aggression for over two decades, his experts failed
to distinguish impulsive aggression involving loss of control, which he does not
exhibit, from his history of premeditated and planned violence, and therefore
noted that they should not conclude he would refrain from planned violence if
placed in another environment, including with other gang members.

[9]  Dr. Denney also testified Mr. Silverstein experienced infrequent bouts of
depression one or two times a year, which was not unusual for inmates, and that
he recovered resiliently from those episodes, or "bounced back," without the need
for treatment.  He further testified Mr. Silverstein complained of memory loss,
and at some point hopelessness, for a period of time but it was not of the
frequency necessary to be considered pervasive.

such care, or asserted sufficient safety or security reasons for his continued

segregated confinement.[10]  However, in addressing Mr. Silverstein's due process

claim, it relied on Mr. Silverstein's extreme violence and membership in the

Aryan Brotherhood as the reasons for the BOP's legitimate penological interest in

retaining him in segregated confinement.  After issuing its final judgment

granting the BOP's motion for summary judgment, the district court further

denied Mr. Silverstein's motions to alter the judgment and supplement the motion

to alter the judgement or, in the alternative, for relief from judgment pursuant to

Federal Rule of Civil Procedure 60(b).[11]  *Silverstein v. Fed. Bureau of Prisons*,

---

[10]  The district court did address the subjective component of Mr. Silverstein's physical health Eighth Amendment claims, finding any delay in treatment of his physical ailments did not subject him to substantial harm because none of those ailments were serious but merely needed constant monitoring and such delay was not a result of deliberate indifference but attributable to institutional constraints.  As a result, it found Mr. Silverstein had not shown a significant risk of serious harm from his physical ailments.  Because Mr. Silverstein does not appeal the ruling on his physical health, we need not address this issue further.

[11]  Mr. Silverstein's second motion contained numerous, newly-submitted news articles and published information on the alleged and/or possible or perceived negative effects of isolation and lack of stimulation on mental health. Thereafter, Mr. Silverstein filed a notice of appeal of the final judgment and, days later, filed an amended notice of appeal which included his appeal of the order denying his post-judgment motions.  However, as the BOP points out, Mr. Silverstein failed in his opening brief to challenge the denial of his post-judgment motions by failing to frame or develop any issue or argument in support thereof, other than to reference the district court's order, which he attached to his brief, and rely on some of the post-judgment materials included in those motions.

Our rules require appellants to sufficiently raise in their opening brief all

(continued...)

2012 WL 4033756, at **6-7 (D. Colo. Sept. 13, 2012) (unpublished op.).

### III. Issues Presented On Appeal

The crux of Mr. Silverstein's appeal rests on his contention the district court erred in determining his thirty-year duration in solitary confinement does not violate the Eighth Amendment as cruel and unusual punishment. In support, he contends the district court impermissibly ignored the first twenty-two years of his confinement on statute of limitations grounds when it should have considered his ongoing isolation since 1983, and that it improperly resolved the factual dispute as to whether thirty years of isolation from social contact and

---

[11](...continued)
issues and arguments on which they desire appellate review, and an issue or argument insufficiently raised, framed, or developed is deemed waived. *See* Fed. R. App. P. 28(a)(8)(A)-(B); *Therrien v. Target Corp.*, 617 F.3d 1242, 1252-53 (10th Cir. 2010); *Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007); *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994). As a result, we decline to address the district court's denial of those motions on appeal, other than noting their consideration would not change our disposition of this appeal.

Based on the same reasoning, we grant the BOP's motion to strike portions of Mr. Silverstein's appendix that contain new materials from his motion to alter or amend judgment. Not only has Mr. Silverstein not provided sufficient argument relating to these materials but he has not shown they were before the district court prior to its ruling on the summary judgment motion. Similarly, with respect to the studies and publications submitted by the amici curiae, both Mr. Silverstein's and the BOP's counsel conceded those materials were not submitted into the record. Mr. Silverstein, however, contends they are similar to the studies and publications he has provided. Even if we considered or took judicial notice of these materials, which are comprised primarily of newspaper clippings and publications, they would not change the disposition of this appeal, as discussed hereafter.

environmental stimulation harmed him or places him at risk of future harm. Rather than allowing these factual disputes to go to trial, he contends, the district court resolved them in favor of the BOP, thereby ignoring the length of deprivation he has suffered and overlooking significant evidence demonstrating both actual harm and risk of future harm relating to his mental health.

In making these arguments, Mr. Silverstein points out he: 1) eats alone and has no face-to-face interaction with others unfettered by glass, bars, chains, or other restraints; 2) has little variation in what he sees or experiences; 3) has minimal contact with other prisoners, staff, and visitors, lasting only a minute or so per day;[12] and 4) lacks the opportunity for phone calls and visitation because the BOP's prison policy precludes inmates from visiting with anyone they did not know prior to incarceration. As a result of such social isolation and lack of environmental stimulation, he claims he developed an anxiety disorder, suffers from depression, sleep deprivation, and despair, and is experiencing memory loss and likely cognitive impairment–all conditions which he says he has been complaining of for over twenty years.

In further support of his claim, Mr. Silverstein relies on Dr. Haney's review of his BOP central file, in which he primarily considered the ten-year period from the late 1980s to late 1990s, and his complaints concerning his symptoms of

---

[12] The BOP did not dispute his assertion most of his daily interaction with staff lasted less than a minute per interaction.

mental health contained therein. Mr. Silverstein points out BOP medical staff noted in their logs that he showed signs of "withdrawal and depression" and "affect and mood that were flat and solemn" and that he: 1) "appeared to have trouble engaging in higher-order reasoning and conversation"; 2) "chose to live in 'near-darkness'"; and 3) had "lazy" interpersonal skills–all producing a suggestion by the BOP's psychologist that "staff be encouraged to foster more interpersonal communication/interaction" with him. Similarly, he points out that since his lawsuit commenced, he has been screened for memory loss and cognitive decline, and one expert, Dr. Williams, suggests his memory impairment could be directly caused by his isolation and sensory deprivation. He also relies on Dr. Friedman's statement his isolation "may be" associated with his cognitive impairment and "his conditions of confinement are likely causing or exacerbating his indicated memory loss."

Mr. Silverstein further claims that despite medication and visits with staff, he continues to suffer from depression, anxiety, and despair and that he is at a substantial risk of future harm if he remains in isolation, based on: 1) research showing such long-term isolation results in serious psychological harm; and 2) his own exhibited symptoms of psychological injury. Finally, with regard to his request for declarative and injunctive relief, Mr. Silverstein, in his appellate brief and during oral argument, asks that his "isolation [be] lessened" and that, while he might not be allowed in the open prison population "immediately," he asks that

"improvements" be made. Without further clarification as to what restrictions he desires to be lessened, we assume he is continuing to request, as he did in his second amended complaint, some form of discontinuation of his current confinement and an order transferring him to another facility with less restrictive and severe conditions of confinement, or, alternatively, his assignment to a "step-down" or other program in which he could earn or advance to less restrictive conditions of confinement.

In response, the BOP contends Mr. Silverstein fails to satisfy the objective component of his Eighth Amendment claim because his symptoms of depression, anxiety, cognitive impairment, and memory loss are mild, and no expert was able to definitively conclude these mild conditions were caused by his segregated detention or that his isolation poses a substantial risk of future harm to him, given none of his mental conditions are severe and he has medicine and treatment available to him. Even if Mr. Silverstein satisfied this objective component, it argues, the district court's decision may be affirmed on alternate grounds based on the subjective component in an Eighth Amendment analysis because he failed to show the BOP acted with culpable intent or deliberate indifference to his mental health or safety. With regard to the issue of safety, it suggests the duration of Mr. Silverstein's segregation is justified and legitimately stems from his multiple murders and other past serious infractions, as well as his membership and leadership in the Aryan Brotherhood, all of which make him dangerous and

legendary and create a continuing security concern for the general prison population and BOP staff. In addition, it contends the district court appropriately concentrated only on his incarceration at ADX Florence and his present conditions because a six-year statute of limitations exists on his Eighth Amendment claim which is limited to equitable injunctive relief from his current confinement.

## IV. Statute of Limitations

On appeal, Mr. Silverstein provides no citation or authority for the purpose of contesting the six-year statute of limitations under 28 U.S.C. § 2401(a) as applied by the district court. Instead, he insists the duration of his solitary confinement should not be barred by any such limitation and relies on cases discussing the duration of confinement but not the issue of the effect of any statute of limitations on his Eighth Amendment claim for injunctive relief.

We review de novo issues relating to the statute of limitations under 28 U.S.C. § 2401(a) of the Federal Tort Claims Act. *See Ute Distrib. Corp. v. Sec'y of Interior*, 584 F.3d 1275, 1282 (10th Cir. 2009). As the district court indicated, § 2401(a) applies to equitable claims. *See United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1210 (10th Cir. 2001). We have also held "[d]etermination of the accrual date of an action is critical for purposes of applying [28 U.S.C.] § 2401(a)." *See Ute*, 584 F.3d at 1282. Generally, the Federal Tort Claims Act represents a waiver of sovereign immunity which must be strictly construed. *See*

*Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89, 94 (1990).  Section 2401(a)

provides that "every civil action commenced against the United States shall be

barred unless the complaint is filed within six years after the right of action first

accrues."  28 U.S.C. § 2401(a).  *See also Smith v. City of Enid*, 149 F.3d 1151,

1154 (10th Cir. 1998).  As a result, we cannot ignore the statute of limitations

provided in § 2401.

Because Mr. Silverstein's initial complaint was not filed until 2007,[13] the

statute of limitations has run on his Eighth Amendment claim for any injuries or

conditions concerning any time frame prior to 2001.[14]  In addition, because Mr.

Silverstein requests equitable injunctive relief from the conditions he is currently

enduring at ADX Florence, where he has been housed since 2005, we agree with

the district court that our consideration of the conditions of his earlier

---

[13]  We apply the statute of limitations to the date of Mr. Silverstein's initial complaint, filed in 2007 and dismissed without prejudice in 2009, which the BOP suggests is the complaint from which the limitations period runs, rather than his second amended complaint filed in 2009.

[14]  Our conclusion is in concert with other statute of limitations decisions in this circuit, albeit unpublished but persuasive.  *See Fogle v. Slack*, 419 F.App'x 860, 864-65 (10th Cir. 2011) (unpublished op.) *(*concluding statute of limitations barred prisoner's claim concerning his three-year segregation in three facilities and that continuing violation doctrine did not apply because each segregation decision was made by different decision makers from three correctional facilities, making it inappropriate to aggregate all into one continuing violation for limitations purposes); *Gee v. Murphy*, 325 F.App'x 666, 668 (10th Cir. 2009) (unpublished op.) (holding one-year statute of limitations foreclosed review of inmate's assignment to administrative segregation in 2005 but not with respect to action taken in 2008).

incarceration at Leavenworth is not appropriate since no equitable relief is available from conditions at a facility where he is no longer housed and has not shown he is likely to be housed again.

With respect solely to the duration of his confinement, which he points out has been continuing and uninterrupted for over thirty years, we have held the continuing wrong doctrine "cannot be employed where the plaintiff's injury is definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress." *Tiberi v. CIGNA Corp.*, 89 F.3d 1423, 1431 (10th Cir. 1996) (internal quotation marks omitted). *See also Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1184 (10th Cir. 2003) (holding a continuing violation claim fails if one knew or through exercise of reasonable diligence would have known of his injury). While Mr. Silverstein relies on cases establishing that even a few years of solitary confinement under certain harsh conditions may rise to an Eighth Amendment violation, he has not shown anything prevented him from seeking redress years ago, especially in light of his assertion he became aware of the decline in his mental health at least twenty years ago.

While the Supreme Court has recognized equitable tolling may occur in suits against the government, it has also held it may occur only in circumstances involving more than a mere lack of due diligence. *See Irwin*, 498 U.S. at 95-96. Accordingly, we have held placement in administrative segregation or solitary confinement is generally not grounds for equitable tolling absent extraordinary

circumstances. *See Miller v. Marr*, 141 F.3d 976, 978 (10th Cir. 1998). Moreover, in at least one other case, we have concluded the continuing violation doctrine cannot apply to a prisoner's claim concerning his isolated segregation in different facilities when each segregation decision is made by a different decision maker. *See Fogle*, 419 F.App'x at 864-65. However, even if we applied equitable tolling or the continuing wrong doctrine to the total thirty years of his confinement, Mr. Silverstein cannot prevail on the duration issue, as discussed hereafter.

## V.  Summary Judgment Standard of Review and Other Applicable Legal Principles

We review de novo the district court's summary judgment decision, examining the record and drawing all reasonable inferences in the light most favorable to the nonmoving party, which in this case is Mr. Silverstein. *See Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005). Summary judgment is appropriate if the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* (relying on Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Mackenzie v. Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005). Movants for

summary judgment bear the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). If this initial burden is carried, the nonmovant may not rest solely on his pleadings, but must set out specific facts in support of his claims by reference to affidavits, deposition transcripts, or other exhibits incorporated therein. *Id.* at 671. In ruling on the grant of summary judgment, "[w]e can affirm on any ground supported by the record, so long as the appellant has had a fair opportunity to address that ground." *Schanzenbach v. Town of Opal*, 706 F.3d 1269, 1272 (10th Cir. 2013) (internal quotation marks omitted). We may rely on unpublished cases with similar circumstances and issues for their persuasive value, even if they are not precedential. *See* Fed. R. App. P. 32.1(a) *and* 10th Cir. R. 32.1(A).

The Eighth Amendment prohibits the infliction of "cruel and unusual" punishment. *See* U.S. Const. amend. VIII. The Supreme Court has held "the unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment forbidden by the Eighth Amendment, *Whitley v. Albers*, 475 U.S. 312, 319 (1986), and "[a]mong unnecessary and wanton inflictions of pain are those that are totally without penological justification," *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (internal quotation marks omitted). Turning specifically to solitary confinement issues, generally, "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of

confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms*, 459

U.S. 460, 468 (1983). "To the extent that such conditions are restrictive and even

harsh," but not cruel and unusual, "they are part of the penalty that criminal

offenders pay for their offenses against society." *Rhodes,* 452 U.S. at 347. The

Supreme Court has held "administrative segregation is the sort of confinement

that inmates should reasonably anticipate receiving at some point in their

incarceration." *Hewitt*, 459 U.S. at 468. *See also Penrod v. Zavaras*, 94 F.3d

1399, 1407 (10th Cir. 1996). We have similarly held that placing an inmate in

such segregation as a preventive measure does not necessarily violate the Eighth

Amendment. *See Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987).

While there is no "static test" used to determine what types of conditions in

administrative segregation violate the Eighth Amendment, courts must look at

"'evolving standards of decency that mark the progress of a maturing society.'"

*Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) (quoting *Rhodes*, 452

U.S. at 346). To be considered cruel and unusual, the conditions of confinement

must: 1) be grossly disproportionate to the severity of the crime warranting

punishment, 2) involve the wanton and unnecessary infliction of pain, or 3)

deprive an inmate of the minimal civilized measure of life's necessities. *See*

*Rhodes*, 452 U.S. at 346-47. We have held corrections officers are responsible

under the Eighth Amendment "to provide humane conditions of confinement by

ensuring inmates receive the basic necessities of adequate food, clothing, shelter,

-29-

and medical care and by taking reasonable measures to guarantee the inmates' safety." *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998).

"An inmate making an Eighth Amendment claim for constitutionally inadequate conditions of confinement must allege and prove an objective component and subjective component associated with the deficiency" claimed. *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001). "The objective component requires conditions sufficiently serious so as to 'deprive inmates of the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes*, 452 U.S. at 347). "Alternatively, a condition must be sufficiently serious so as [to] constitute a substantial risk of serious harm." *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993)). In turn, "[t]he subjective component requires that a ... prison official have a culpable state of mind, that he or she acts or fails to act with deliberate indifference to inmate health and safety." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 297, 303 (1991)). The subjective component is met if the prisoner shows the defendants "knew he faced a substantial risk of harm and disregarded that risk 'by failing to take reasonable measures to abate it.'" *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). On the other hand, if an official is aware of the potential for harm but takes reasonable efforts to avoid or alleviate that harm, he bears no liability. *See DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001). This is "because the Eighth Amendment requires only 'reasonable safety,'" so that

"prison officials who 'actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.'" *Howard v. Waide*, 534 F.3d 1227, 1239 (10th Cir. 2008) (quoting *Farmer*, 511 U.S. at 844-45).

In considering such components in the context of mental health, we have held the Eighth Amendment may be implicated by the infliction of psychological harm but that "[t]he *actual extent* of any ... psychological injury is pertinent in proving a substantial risk of serious harm." *Benefield v. McDowall*, 241 F.3d 1267, 1272 (10th Cir. 2001) (emphasis added). We have also said it is important to consider the conditions of confinement as a whole because several deprivations in combination may constitute a constitutional violation. *See Wilson*, 501 U.S. at 304. The failure to provide basic necessities, if sufficiently prolonged and severe, can satisfy the objective prong of the Eighth Amendment test. *See Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998). Thus, the length of time of confinement is "simply one consideration among many" in an Eighth Amendment inquiry. *See Hutto v. Finney*, 437 U.S. 678, 687 (1978). Nevertheless, the duration of one's administrative segregation is part of our Eighth Amendment consideration for the purpose of determining whether such duration is cruel and unusual in light of the conditions imposed.

In viewing both the conditions and duration of one's confinement, "[w]e must accord substantial deference to the professional judgment of prison

administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). As such, they are entitled to "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). The opinion of a prison administrator on how to maintain internal security carries great weight and the courts should not "substitute their judgment for that of officials who have made a considered choice." *Whitley*, 475 U.S. at 321-22.

As a result, we are particularly deferential to prison administrators' judgment if "[a]ccommodating [an inmate's] demands would ... impair the ability of corrections officers to protect all who are inside a prison's walls." *Overton*, 539 U.S. at 135. In that regard, a "prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Rhodes*, 452 U.S. at 349 n.14. The government's first obligation "must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson v. Austin*, 545 U.S. 209, 227 (2005). Indeed, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners," *Farmer*, 511 U.S. at 833, and for Eighth Amendment purposes, "it does not matter whether the risk comes from a single source or multiple sources," *id.* at 843. Only when a prison

-32-

administrator's actions are taken in bad faith and for no legitimate purpose are they not insulated from our review. *See Whitley*, 475 U.S. at 322. As a result, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer*, 511 U.S. at 828. But even if certain prison actions may impinge on an inmate's constitutional rights, they may nevertheless be valid if reasonably related to a legitimate penological interest. *See Frazier v. Dubois*, 922 F.2d 560, 562 (10th Cir. 1990) (relying on *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

## VI. Discussion

It is undisputed that on July 12, 2005, the BOP transferred Mr. Silverstein to Range 13 of ADX Florence where he could not communicate with other inmates but had access to exercise for an average of one and a half to two hours daily, five days a week, as well as daily, if minimal, contact with BOP staff. He also had access to medical care and was evaluated thirty-nine times in less than three years. In April 2008, he was moved to a general population cell in the D-Unit, where he remains housed today, and, since August 2009, he has been subjected to the same procedures and received most of the same privileges as all other ADX Florence general population inmates.

With respect to the conditions of his current confinement, he is not totally isolated as he: 1) has daily contact with three shifts of BOP guards and daily interaction with other staff, even if the time of contact is minimal; 2) can

-33-

communicate with other inmates (albeit by yelling from cell to cell or during adjacent recreation); 3) receives a minimum of two fifteen-minute telephone calls and up to five social visits per month, even if his family cannot travel to Colorado; 4) has a black-and-white television with sixty channels and closed-circuit programs, including educational programming through which he has completed education courses; 5) has access to art supplies, radio, and digital music channels; and 6) corresponds with others. He has a shower stall, sink, hot water, toilet, concrete stool, desk, and shelf; receives a "no-flesh" diet, as desired; is provided ten hours of recreation time per week, including access to both indoor and outdoor recreation; and can control his cell lights, even though hall lights are on twenty-four hours a day.[15] From his arrival at ADX Florence through November 2010, prison psychiatric staff evaluated him at least forty-nine times. As alleged in his appeal, Mr. Silverstein eats alone and has no face-to-face interaction with others unfettered by glass, bars, chains, or other restraints, and his contact with others is minimal, lasting only a minute or so. These are the conditions from which he now requests injunctive relief.

This circuit has not definitively determined whether a lack of social contact

---

[15] While he complains of insomnia from his lighting conditions, Mr. Silverstein has not indicated that he is prevented from covering his eyes, he now has control over his cell lighting, and the hall lighting of which he complains is much improved over his prior confinement in another facility where his cell light was on twenty-four hours a day. *See Wilkinson*, 545 U.S. at 214 (regarding twenty-four-hour lights on in cell with discipline if inmates covered their eyes).

and environmental stimulation rises to an Eighth Amendment violation.[16]

However, even if we determined it did, we cannot say his living conditions, including the amount of social contact and environmental stimuli Mr. Silverstein receives, are sufficiently serious so as to "deprive [him] of the minimal civilized measure of life's necessities." *See Rhodes*, 452 U.S. at 347. Indeed, on numerous occasions, we have upheld the same or similar conditions as not violating the liberty and other rights of an inmate, albeit in shorter duration than presented here.[17] As to social contact and environmental stimuli specifically, Mr.

_____

[16] The Supreme Court, in *Wilkinson*, indicated allegations of certain harsh conditions, together with deprivation of almost any environmental or sensory stimuli and any human contact, could be sufficient to rise to a Fifth Amendment due process claim concerning a significant and atypical hardship. *See* 545 U.S. at 214, 224.

[17] *See Ajaj v. United States*, 293 F.App'x 575, 582-84 (10th Cir. 2008) (unpublished op.) (holding twenty-three-hour lock down per day, indefinite confinement, and limited ability to exercise outdoors did not individually or in concert amount to Eighth Amendment violation); *DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1343 (10th Cir. 2007) (holding no constitutional violation for segregated inmate who had, in part, clean clothing and personal hygiene items, access to meals, library, recreation, and over five hours of out-of-cell time per day and who had access to prison programs and received monthly visits from psychiatric specialist); *Jordan v. Fed. Bureau of Prisons*, 191 F.App'x 639, 644-45, 652 (10th Cir. 2006) (unpublished op.) (holding, in part, that one social call per month and five hours of exercise each week, together with contact with prison staff, while inmate remained in administrative segregation for five years, did not violate his due process rights or otherwise rise to an atypical and significant hardship); *Villarreal v. Harrison*, 201 F.3d 449, 1999 WL 1063830, at *2 & n.1 (10th Cir. 1999) (unpublished op.) (affirming summary judgment decision explaining restricted telephone privileges and eating alone in cell did not rise to constitutional deprivation); *Blum v. Fed. Bureau of Prisons*, 189 F.3d 477, 1999 WL 638232, at *3 (10th Cir. Aug. 23, 1999) (unpublished op.) (considering

(continued...)

Silverstein is not devoid of either. As noted, he has art supplies, reading materials, and multiple libraries; corresponds with others; has access to radio, television, digital music channels, and closed circuit programming from which he may take courses; can communicate with other inmates; and has indoor and outdoor recreation. He also has daily interaction, however limited, with a variety of prison staff. Thus, despite the restrictions he is under, Mr. Silverstein nevertheless maintains a degree of social contact and environmental stimuli which we conclude does not violate his Eighth Amendment right to be free from cruel and unusual punishment.

Turning to his current mental health, the BOP agrees that since his transfer to ADX Florence, Mr. Silverstein has been diagnosed with anxiety disorder and tested positive for cognitive impairment. It also admits he reported various symptoms of psychological distress to BOP officials over the years, including hopelessness, troubles with concentration, memory loss, and depression.

---

[17](...continued)
disciplinary detention and concluding ninety-day confinement without store privileges, radio, and phone calls as enjoyed by other inmates in segregation did not violate inmate's rights). *Cf. Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 806, 810 (10th Cir. 1999) (holding claim of psychological and physical injuries related to denial of any outdoor exercise stated an Eighth Amendment claim surviving motion to dismiss); *Mitchell*, 80 F.3d at 1442 (concluding inmate's placement in cell with no clothing, inadequate ventilation, and no heat, mattress, bedding, writing utensils, hot water, toilet paper, or exercise could constitute violation of Eighth Amendment); *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980) (recognizing prison must provide an inmate with reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities).

However, the "inevitable byproduct" of anyone facing a long sentence, even if they are not in solitary or segregated confinement, may include "depression, hopelessness, frustration, and other such psychological states." *Jackson v. Meachum*, 699 F.2d 578, 584 (1st Cir. 1983). *See also In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 472 (4th Cir. 1999) (holding "[d]epression and anxiety are unfortunate concomitants of incarceration"). Here, regardless of his segregated confinement, Mr. Silverstein faces three life sentences, which most certainly must cause depression, and which the Chief Psychologist, Dr. Denney, admitted Mr. Silverstein suffers from once or twice a year, while also pointing out such depression is not atypical for inmates and that Mr. Silverstein resiliently recovers from these bouts of depression without the need for treatment.

Moreover, in the instant case, all the experts involved indicate Mr. Silverstein's symptoms of anxiety, memory loss, cognitive impairment, and depression are currently mild or, as otherwise stated, he has no major mental health issues, and none of the experts have definitively stated any of his mental health symptoms have been caused by the conditions or duration of his segregated confinement. Indeed, his expert, Dr. Haney, concluded Mr. Silverstein was not suffering from a major mental illness which would provide "a significant impairment in [his] ability to function on a day-to-day basis," acknowledged he possessed "psychological resiliency," and said he "saw no direct evidence of

*major mental illness* either reflected in Mr. Silverstein's BOP Central File or in the course of my two interviews with him." (Emphasis added.) Dr. Haney also explained his behavioral observations were based almost exclusively on his review of Mr. Silverstein's central file for the ten-year period from the late 1980s to late 1990s. However, that period is not within the six-year statute of limitations period and is prior to his instant confinement in ADX Florence where the conditions of his confinement have actually significantly improved.

While Mr. Silverstein states one of his other doctors, Dr. Williams, found his memory impairment could be directly caused by his isolation and sensory deprivation, the record also shows the same expert stated, "I was unable to discern the causes of Mr. Silverstein's positive screen for memory impairment," and we further note that while she commented on his mental health, she is an internal medicine and geriatric doctor, rather than a licensed psychiatrist. In addition, while Dr. Friedman opined Mr. Silverstein's "[i]solation *may* be associated with cognitive impairment," he found such impairment mild and did not definitively state Mr. Silverstein's cognitive impairment was caused by his segregation. He stated Mr. Silverstein never presented himself in a manner suggesting "he was suffering from a mental health disorder ...."

Nevertheless, Mr. Silverstein points out BOP medical staff noted in their logs that he showed signs of "withdrawal and depression" and "affect and mood that were flat and solemn," appeared to have "trouble engaging in higher-order

reasoning and conversation," "chose to live in 'near-darkness,'" and had "lazy" interpersonal skills–all producing a suggestion by the BOP's psychologist that "staff be encouraged to foster more interpersonal communication/interaction" with him. These entries were made prior to 2005 and the time in question, and none establish his symptoms were related to serious mental health issues or were pervasive for the purpose of requiring mental health treatment or rising to an Eighth Amendment claim. Moreover, entries by BOP medical staff beginning in 2005, from the time of his transfer to ADX Florence, demonstrate he did not raise any mental health complaints or concerns and indicated to staff almost every time he was seen that he did not desire or need psychological services. They also indicate he "had a lively and spirited conversation"; "voiced no complaint of [a] psychological nature"; was "doing well"; appeared to be "calm and relaxed" and "cooperative"; was on many occasions "in good spirits"; and presented himself as "personable and cooperative," "well-oriented and stable," "humorous," "upbeat," "affable," and "alert." On only one occasion did he raise the issue of memory loss, by asking for techniques to improve his memory, at which time staff discussed with him challenging brain activities which might help improve his memory. He did not complain of anxiety until late 2009, after the filing of the instant lawsuit, at which point he was promptly evaluated and treated with medication.

Viewing the facts in the light most favorable to Mr. Silverstein, we cannot

conclude his current mental symptoms of anxiety, depression, memory loss, and cognitive impairment are caused by the conditions of his current segregated confinement rather than the mere fact of his lengthy incarceration itself or some other factor, such as age. Because his current symptoms are mild, he has also not shown his mental health problems are sufficiently *serious* so as to deprive him of the minimal civilized measure of life's necessities, nor has he alleged the BOP disregarded his mental health by failing to take reasonable measures to abate his problems. *See Hunt*, 199 F.3d at 1224. This is important because to prevail on summary judgment, Mr. Silverstein must demonstrate not only that he suffered a *serious* medical or mental disorder but that the BOP was aware of his condition but was deliberately indifferent to his plight. *See Farmer*, 511 U.S. at 828, 847. The BOP has "responded reasonably" to his mild mental health symptoms by improving the conditions of his confinement, including the social and environmental stimuli, by ensuring he has daily interaction with staff and providing him with psychiatric evaluations and care, access to programs, materials, and medications, "even if the harm ultimately [is] not averted." *See id.* at 844-45. Thus, regardless of whether Mr. Silverstein's current mental health issues are the inevitable result of his three life sentences or his placement in segregated confinement, the BOP has provided Mr. Silverstein with psychiatric evaluation; treatment if needed or on request, which he has in the past declined; and self-help materials and participation in a psychiatric program, which he has

also refused.  Undisputedly, it has taken reasonable efforts to avoid or alleviate the symptoms of which he complains.  *See DeSpain*, 264 F.3d at 975.  This leaves no genuine issue of fact for which there is liability as a matter of law regarding his current mental health.

We now turn to the issue of whether the conditions related to his mental health are sufficiently serious so as to constitute a substantial risk of serious harm for the purpose of meeting the requisite objective component.  Mr. Silverstein's experts, as well as the amici curiae, opine that his anxiety, depression, memory loss, and cognitive impairment, together with the lengthy duration of his solitary confinement, are likely to pose a substantial risk of serious harm based on generalized studies concerning other inmates who are similarly incarcerated in solitary confinement.  However, while we have held the Eighth Amendment may be implicated by the infliction of psychological harm, we have also said "[t]he *actual extent* of any ... psychological injury is pertinent in proving a *substantial risk* of serious harm."  *Benefield*, 241 F.3d at 1272 (emphasis added).  The Supreme Court has indicated such a risk is an excessive risk to inmate health or safety.  *See Wilson*, 501 U.S. at 302-03.

Here, Mr. Silverstein's symptoms have been described by all the experts as mild and he has access to medical treatment and medications so that, arguably, he has failed to show he is at a *substantial* or *excessive* risk of serious harm or that

he is comparable to inmates in the generalized studies relied on by his experts.[18]

Moreover, even if some risk of serious harm exists, it is clear the BOP has not

disregarded that risk by failing to take reasonable measures to abate the harm.

Instead, it has significantly improved the conditions of his solitary confinement

from the conditions he endured at other facilities.[19]  Not only are his living

conditions in his segregated cell the same as those in the ADX Florence general

prison population, where he is not deprived of the minimal civilized measure of

life's necessities, but he is receiving the most social access and environmental

stimuli he has received since entering segregated confinement in 1983, and, as

previously noted, he has been provided access to psychiatric evaluation,

medication, and treatment.[20]  Thus, not only has the objective component not been

met, but the same is true of the subjective component because the BOP has

undisputably taken reasonable efforts to avoid or alleviate the potential for

---

[18] *See Gambina v. Fed. Bureau of Prisons*, 529 F.App'x 900, 902-03 (10th Cir. 2013) (unpublished op.) (rejecting an inmate's Eighth Amendment claim even though he endured twenty-one years in solitary confinement at ADX, finding, like here, that he failed to raise a genuine issue of material fact as to whether the conditions or duration of his confinement posed a substantial risk of serious harm).

[19] *See Ajaj*, 293 F.App'x at 579-80 (holding prison authorities did not disregard health concerns of inmate by failing to move him to another facility given they attempted to accommodate his need for nonsmoking environment by placing him near cells of nonsmoking inmates and installing air filters in his cell).

[20] Not only has Mr. Silverstein been evaluated at least forty-nine times since arriving at ADX Florence, but from 2001 to 2005 he was evaluated by a staff psychologist or psychiatrist approximately forty-seven times.

substantial serious harm.  *See DeSpain*, 264 F.3d at 975.

We now turn to perhaps Mr. Silverstein's most compelling issue and argument relevant to his Eighth Amendment claim, which is the very lengthy duration of his solitary or segregated confinement.  Mr. Silverstein asks us to consider the fact that he has been in such confinement for more than thirty years without interruption, which he contends violates his Eighth Amendment right to be free from cruel and unusual punishment.  Thirty years is indeed an *extraordinary* length of time to live in segregation, under any conditions.  But even if we declined to apply the six-year statute of limitations, as he suggests, on grounds of a continuing violation or equitable tolling, we cannot look at those thirty years alone without considering the reasons for both his confinement and the continuation of his confinement in such isolation.

Up until 1988, Mr. Silverstein committed at least three brutal murders, was implicated in two others, assaulted three staff members, threatened a staff member, made an escape attempt by posing as a United States Marshal, and possessed weapons, including two hacksaw blades, handcuff keys, and two lock picks.  Indeed, with respect to at least one of his murders, the Seventh Circuit stated his appeal afforded "a horrifying glimpse of the sordid and lethal world of modern prison gangs." *Silverstein II*, 732 F.2d at 1341.  Even the Supreme Court has cited Mr. Silverstein's prior murder cases three times as an example of the type of brutal prison murders perpetrated by its gang members.  *See Johnson v.*

-43-

*California*, 543 U.S. 499, 533-34 nn.7-8 (2005) (dissent); *Wilkinson*, 545 U.S. at 227; *Dawson v. Delaware*, 503 U.S. 159, 173 (1992). In direct reference to Mr. Silverstein's murder case, the Supreme Court noted there is a lack of any deterrent punishment for gang members, like Mr. Silverstein, who are serving life sentences without the possibility of parole, *see Johnson*, 543 U.S. at 533-34 & n.8, and explained the use of high security prisons has increased in "response to the rise in prison gangs and prison violence" and that "prison security" is "imperiled by the brutal reality of prison gangs," *Wilkinson*, 545 U.S. at 213, 227. It is no surprise then that the BOP, in an attempt to protect other inmates and its staff, has held Mr. Silverstein in segregated confinement with heightened security precautions.

While Mr. Silverstein now claims he should be removed from such confinement as he is no longer a security risk, as evidenced by his low-level violence rating given by BOP staff, it is undisputed his institutionally conforming conduct occurred when he was not with other inmates and that his conduct, when he was previously allowed to have physical proximity to other inmates, has been marked by threats, assaults, and murders. According to two of the BOP's mental health providers, the low-risk rating was given based on his current housing where he has no access to weapons or potential victims.

In addition, the BOP has provided undisputed, chilling facts as to how the Aryan Brotherhood operates, Mr. Silverstein's association and history with that

gang, and its reasonable belief a substantial security risk exists with regard to him and others if he is no longer segregated. Not only has Mr. Silverstein established his credentials and legendary status with various gangs by committing multiple murders, but retirement from the Aryan Brotherhood does not exist, and if a member, like Mr. Silverstein, is asked to resume in his "shot caller" role or otherwise instructed to perform a violent task or act, he must do so or likely be disciplined, either by beating or death, as part of the gang's code of conduct. *See Wilkinson*, 545 U.S. at 227 (relying on *Silverstein II*, 732 F.2d at 1341, in noting murder of an inmate is a common form of gang discipline as well as a condition for membership in some gangs).

As a result, despite whether he has actually left the gang as he claims or perceives, the BOP has provided its well-grounded belief, based on expert evidence, that a serious risk exists that Mr. Silverstein may be required, for his own preservation, to resume his role, either as a leader or murderer, or take some other violent course or otherwise risk his own death or serious injury. Moreover, even if Mr. Silverstein has somehow separated himself from the Aryan Brotherhood, in order for the BOP to protect him he must enter protective custody in which he would still be required to be separated from other inmates for his own protection.

It is also clear, based on the BOP's expert evidence, that a deadly rivalry exists between the D.C. Crew and the Aryan Brotherhood, they make retaliatory

hits against each other, and members of the D.C. Crew and Aryan Brotherhood are separated in all federal prisons and no influential member of either gang is allowed to interact in the open prison population. This would include Mr. Silverstein, who not only killed at least one leader of the D.C. Crew, but was an influential member of his gang, holding one of the top three positions as a commissioner for the Aryan Brotherhood. Thus, a risk remains the D.C. Crew may avenge Mr. Smith's murder by murdering Mr. Silverstein himself. Finally, as the Supreme Court noted in its direct reference to Mr. Silverstein, there is a lack of deterrent punishment sufficient to prevent inmates like him from committing future violent acts when they are serving life sentences without the possibility of parole. *See Wilkinson*, 545 U.S. at 227.

At this juncture, it is worth repeating that the BOP's first obligation is to ensure "the safety of guards and prison personnel, the public, and the prisoners themselves." *Id.* at 211. Not only is the BOP responsible for providing humane conditions of confinement and medical care but it must take "*reasonable measures to guarantee the inmates' safety*." *Barney*, 143 F.3d at 1310 (emphasis added). As such, the BOP has a duty to protect Mr. Silverstein from rival gang members and them from him.[21] *See Farmer*, 511 U.S. at 833. We must accord

---

[21] Our circuit is replete with cases on the government's responsibility to protect inmates from each other or claims that prison officials showed deliberate indifference to a prisoner's safety due to harm or the risk of substantial harm imposed by other prisoners, including members of the Aryan Brotherhood. *See*

(continued...)

substantial deference to the BOP determination to separate such gang members from each other and keep influential members of gangs, like Mr. Silverstein, from interacting in the open prison population for the purpose of inmate safety, preserving internal order and discipline, and maintaining institutional security. *See Overton*, 539 U.S. at 132; *Bell*, 441 U.S. at 547.

In this regard, we find the Ninth Circuit's decision in *Griffin* persuasive. *See* 741 F.3d at 10. By January 2014, when the court issued its decision, Mr. Griffin had been imprisoned forty-four years, or since 1970. *Id.* at 10-11. Like Mr. Silverstein, he is a member of the Aryan Brotherhood and committed violent

[21](...continued)
*Driggers v. Clark*, 422 F.App'x 747 (10th Cir. 2011) (unpublished op.) (regarding segregated confinement of prior KKK member with Aryan Brotherhood member); *Howard*, 534 F.3d at 1227 (holding inmate, attacked by 2-11 Crew gang members, presented adequate evidence of prison officials' failure to protect him sufficient to survive summary judgment); *DiMarco*, 473 F.3d at 1342-43 (holding prison official had legitimate reason to segregate hermaphrodite inmate for her protection and the protection of other women inmates); *Smith v. Beck*, 165 F.App'x 681 (10th Cir. 2006) (unpublished op.) (regarding allegation inmate's Eighth Amendment right to be free from cruel and unusual punishment was violated after being attacked by Aryan Brotherhood gang); *Muhammad v. Berry*, 198 F.App'x 738 (10th Cir. 2006) (unpublished op.) (regarding allegation of Eighth Amendment violation for safety and endangerment by housing inmates with Aryan Brotherhood members); *McGee v. Fed. Bureau of Prisons*, 118 F.App'x 471 (10th Cir. 2004) (unpublished op.) (regarding allegation, in part, that attack on inmate, categorized as a member of the Aryan Brotherhood, resulted from prison staff negligence); *Carter v. Padilla*, 54 F.App'x 292 (10th Cir. 2002) (unpublished op.) (holding inmate belonging to Aryan Brotherhood failed to demonstrate deliberate indifference to his safety because his placement in administrative segregation showed some concern for his safety and his attacker was in restraints and escorted by corrections officer at time of assault); *Benefield*, 241 F.3d at 1267 (regarding allegations of substantial risk of harm after prison officer labeled inmate a snitch).

crimes in prison, including the assault and murders of other inmates. *Id.* at 11, 15. Based on his gang activities, Mr. Griffin has been confined to a secure housing unit since at least 1979, or thirty-five years, "to protect other prisoners from him and his gang underlings." *Id.* at 11-12 & n.1, 15. Like Mr. Silverstein, Mr. Griffin has been transferred to various prisons where he has remained in a secure housing unit, served as a commissioner of the Aryan Brotherhood, and been both implicated and convicted of directing Aryan Brotherhood activities and authorizing assaults and murders on other inmates. *Id.* at 12-13, 15, & n.1. Also like Mr. Silverstein, Mr. Griffin sought release from the secure housing unit where he is currently confined, claiming he is no longer active in the gang, even though prison authorities believed such "retirement" would be inconsistent with the gang's requirements. *Id.* at 13.

In vacating the district court's orders for Mr. Griffin's release from his secure housing unit and transfer to the general prison population or to less restrictive housing, the Ninth Circuit recognized the chronic problem within its prisons involving murderous gangs, including the Aryan Brotherhood; discussed the fact that once an inmate is a member of that gang, he remains a member or risks being killed; and that gang members are considered by prison officials to be a severe risk to others, so that they are placed in secure housing units indefinitely. *Id.* at 11, 20. It held prison administrators are entitled to wide-ranging deference with respect to preserving institutional security and ensuring the safety of inmates

and prison personnel and determined that, in Mr. Griffin's case, the prison administrators' fears were well-grounded that he would order more beatings or murders on behalf of the Aryan Brotherhood if placed in less-restrictive housing. *Id.* at 20-21. While it recognized "other prisoners may be murderers, rapists, drug dealers, and child molesters," it explained the government is responsible under the Eighth Amendment to protect them "from murder by other prisoners." *Id.* at 21. It also pointed out inmates are "stripped ... of virtually every means of self-protection," and being violently assaulted in prison "is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 21-22. Finally, it explained "prison authorities must perform a delicate balancing of concerns" by staying within the Eighth Amendment boundaries in the treatment of dangerous criminals like Mr. Griffin, while protecting the very same criminals from each other, "which may entail very severe restraints." *Id.* at 22.

Similarly, while Mr. Silverstein's thirty-year duration in segregated confinement is an extraordinary length of time, we defer to the BOP's judgment that accommodating Mr. Silverstein's demands by releasing him into the open prison population or transferring him to a less secure facility would impair its ability to protect all who are inside the prison's walls, including Mr. Silverstein himself, other inmates, and BOP personnel. *Overton*, 539 U.S. at 136. Instead, the BOP has had to strike a delicate balance between reducing the restrictions imposed on Mr. Silverstein, which it has done since 2005, and its legitimate

security concerns in ensuring the security of all who come in contact with Mr. Silverstein, as well as his own security, by keeping him in segregated confinement. This is a considered choice for which we should not substitute our judgment.[22] *See Whitley*, 475 U.S. at 321-22. *See also Scarver v. Litscher*, 434 F.3d 972, 976 (7th Cir. 2006) (stating delicate balance is involved in considering the psychiatric health of an inmate over prison security concerns and determining prison authorities must be given considerable latitude in their measures for controlling homicidal maniacs without exacerbating their manias beyond what is necessary for security); *In re Long Term*, 174 F.3d at 470 (holding prison administration often involves tough tradeoffs so that granting greater liberties to some may mean increased danger and intimidation of others). Irrespective of the length of his confinement, Mr. Silverstein's history with regard to both his violent conduct and leadership in the Aryan Brotherhood makes this a *deeply* atypical case and it is clear his segregated confinement is commensurate with ongoing prison security concerns.[23]

---

[22] We also recognize that if Mr. Silverstein is released into the general prison population and an incident occurs in which he or another inmate is injured or killed, the BOP may bear the responsibility for failing to abate the known risk presented. *See Howard*, 534 F.3d at 1239-41 (regarding prison authorities' alleged failure to protect him from gang members); *Carter*, 54 F.App'x at 292 (considering allegation of Eighth Amendment violation when inmate, belonging to Aryan Brotherhood and placed in administrative segregation, was attacked by another inmate).

[23] While the district court did not expressly grant summary judgment on

(continued...)

As a reminder, Mr. Silverstein's violent conduct includes, but is not limited to, his strangling an inmate with a cord through cell bars, stabbing another inmate sixty-seven times, and stabbing a guard twenty-nine times while handcuffed, chained, and surrounded by two other guards. With this history, what inmate, guard, or prison staff member would wish to be the first to encounter Mr. Silverstein if he is released from the restraint of glass barriers, handcuffs, or chains or, of more concern, released into the open prison population for any activity? Certainly, in this case, the risk of death and physical or psychological injury to those exposed to Mr. Silverstein must be balanced with the psychological risk he may face if left in administrative segregation, as countered by any treatment and medication available to him in an effort to avert any risk of future psychological harm. As the Supreme Court states in *Wilkinson*, "harsh conditions may well be necessary and appropriate" in light of the danger that certain high-risk inmates, like Mr. Silverstein, "pose both to prison officials and to other prisoners," and "[p]rolonged confinement in Supermax [or, in this case, ADX] may be the ... only option for the control of some inmates ...." 545 U.S. at 224, 229.

---

[23](...continued)
this ground in discussing his Eighth Amendment claim, as it did in dismissing his Fifth Amendment due process claim, evidence concerning the Aryan Brotherhood, Mr. Silverstein's involvement in that gang, and his security concerns were raised before the district court in regard to his Eighth Amendment claim, and Mr. Silverstein had a fair opportunity to address the issues raised.

Accordingly, we reject Mr. Silverstein's assertion on appeal his conditions and restrictions of confinement are unreasonably harsh for the purpose of rising to an Eighth Amendment violation. The fact Mr. Silverstein eats alone, has no face-to-face interaction with others unfettered by glass, bars, chains, or other restraints, has only brief contact with other prisoners, corrections staff, and visitors, and has his visitations limited to those he knew before his incarceration, are not unduly harsh under the circumstances presented and in light of other cases in which the same or similar conditions have been considered and rejected as not violating a segregated inmate's constitutional rights.[24] Arguably, these type of conditions, when considered together with other harsh deprivations, might be said

---

[24] *See e.g. Jordan*, 191 F.App'x at 644-45, 652 (determining daily interaction with prison staff was, in part, sufficient to overcome due process claim of significant and atypical hardship); *Overton*, 539 U.S. at 126 (determining noncontact visitation restrictions on inmates and prohibition on visits from former inmates or unaccompanied children was related to legitimate penological objectives including internal security); *Villarreal*, 1999 WL 1063830, at *2 n.1 (holding fact inmates in segregated confinement eat alone is insufficient to assert violation of constitutional rights); *Sanders v. Hopkins*, 131 F.3d 152, 1997 WL 755276, at *2 (10th Cir. Dec. 5, 1997) (unpublished op.) (holding handcuffing and shackling inmate when outside cell for the purpose of showering did not contravene Eighth Amendment based on legitimate safely concerns). *See also Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (holding limitations on visitation privileges is constitutionally permissible so that inmates do not have a right to "unfettered visitation"); *Hosna v. Groose*, 80 F.3d 298, 305 n.10 (8th Cir. 1996) (holding handcuffing segregated inmate when outside his cell is reasonable); *Knox v. McGinnis*, 998 F.2d 1405, 1412 (7th Cir. 1993) (explaining practice of handcuffing and shackling segregated inmates who pose security risk does not violate Eighth Amendment); *Tubwell v. Griffith*, 742 F.2d 250, 252-53 (5th Cir. 1984) (same).

to create a constitutional claim with regard to a lack of social contact and environmental stimulation.[25] But that is not the case here, especially when considered with the security risk Mr. Silverstein poses and the other conditions of his solitary confinement, which have undisputedly improved since his current incarceration at ADX Florence.

In sum, under the circumstances presented, regardless of whether we consider the duration of Mr. Silverstein's thirty years of segregated confinement, we cannot say the BOP disregarded any substantial risks to Mr. Silverstein by failing to take reasonable measures to abate them. This includes not only his mental health, as evidenced by improvements to his living conditions since 2005 and his continued evaluation and treatment for his mild psychiatric symptoms, but protecting him from other inmates and them from him. As a result, Mr. Silverstein fails to establish either an objective or subjective component relating to a genuine issue of material fact warranting reversal as a matter of law.

Finally, with respect to the cases on which Mr. Silverstein relies concerning

---

[25] *See Wilkinson*, 545 U.S. at 214, 224 (holding inmates alleged a liberty interest sufficient to survive motion to dismiss by claiming harsh conditions involving twenty-four-hour lights on in cell with discipline if they covered their eyes, rare opportunities for visitation, all events conducted through glass walls, eating their meals alone, no conversation from cell to cell, and essentially deprivation of almost any environmental or sensory stimuli and any human contact). We note that, unlike the inmates in *Wilkinson*, Mr. Silverstein has access to outside and inside recreation ten hours a week, controls the lights in his cell and has not complained he is prevented from covering his eyes, has the opportunity for visitations at least five times a month, may converse from cell to cell, and has contact with staff on a daily basis.

the psychological impact solitary confinement generally has in long duration, they are distinguishable from the instant case given they did not involve the degree of murderous and violent behavior presented here, an inmate's membership and/or leadership position in the Aryan Brotherhood, the same security concerns posed in this case, or the fact Mr. Silverstein's current conditions have improved measurably in comparison to the harsher conditions and restrictions of confinement imposed before he entered ADX Florence. Similarly, Mr. Silverstein's experts' testimony and the generalized studies and literature that he, his experts, and the amici curiae rely on fail to address or adequately address these same circumstances or consider the need to balance Mr. Silverstein's mental health concerns with the legitimate and reasonable grounds for keeping him in administrative segregation for both his safety and the safety of others.

## VII. Conclusion

For the reasons articulated herein, we **AFFIRM** the district court's grant of summary judgment to the BOP. We further **AFFIRM** the district court's denial of Appellant's Motion to Alter or Amend the Judgment and Motion to Supplement His Motion to Alter or Amend the Judgment. We **GRANT** the BOP's February 28, 2013 Motion to Strike Portions of Plaintiff-Appellant's Appendix.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge